AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of Ohio

| United States of America | ) |
|---|---|
| v. | ) Case No. 3:12 MJ 7045 |
| HIROSHI YOSHIDA | ) |
| Defendant(s) | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of **as early as 2003 to as late as 2009** in the county of **Allen** in the **Northern** District of **Ohio**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 15 U.S.C. § 1 | Conspiracy in restraint of trade or commerce among the several states or with foreign nations. |

This criminal complaint is based on these facts:
See attached affidavit.

☐ Continued on the attached sheet.

_____
Complainant's signature

Kevin M. Brown, Special Agent
Printed name and title

Sworn to before me and signed in my presence.

Date: 06/15/2012

_____
Judge's signature

City and state: Toledo, OH

Vernelis K. Armstrong, U.S. Magistrate Judge
Printed name and title

3:12 MJ 7045

## AFFIDAVIT SUBMITTED UNDER SEAL

I, Kevin Brown, Special Agent with the Federal Bureau of Investigation, Cleveland Division, hereinafter referred to as the Affiant, being duly sworn, state that:

1. The Affiant has been employed by the Federal Bureau of Investigation ("FBI") for approximately ten years.

2. The Affiant is a Special Agent with the FBI assigned to the Cleveland Division and has been employed in this position for approximately 10 months. The Affiant is currently assigned to investigate public corruption and antitrust matters. Prior to this assignment, the Affiant was assigned to the FBI's New York Office for approximately 9 years, where the Affiant investigated organized crime matters, white collar crime, antitrust matters, and bankruptcy fraud, among other things.

3. Throughout the course of the Affiant's employment with the FBI, the Affiant has participated in conducting interviews, arrests, searches, and surveillances, working with cooperating witnesses, performing financial investigations, and other related investigative tasks. In the course of the Affiant's work on antitrust matters, the Affiant also has become familiar with the U.S. Department of Justice, Antitrust Division's ("DOJ") Leniency Program.

## BASIS OF INFORMATION

4. Except as otherwise noted, the information set forth in this Affidavit is based on documents or statements originally in Japanese; consequently, the information has been provided to the Affiant with the aid of Japanese-language interpreters and translators. In addition to the Affiant's own interviews with witnesses, other investigative activities, and review of documents, the Affiant also relies on interviews conducted by FBI Special Agent Matthew Sante of the FBI's Cleveland Division. Whenever in this Affidavit the Affiant asserts that a statement was made, the information was either

1

3:12 MJ 7045

obtained by the Affiant through an interpreter/translator, or provided to the Affiant by Special Agent Sante (who also employed the aid of an interpreter/translator).

5. Since the Affidavit is being submitted for the limited purpose of securing an arrest warrant, the Affiant has not included each and every fact known to him concerning this investigation. The Affiant has set forth only the facts that he believes are necessary to establish the foundation for the issuance of an arrest warrant.

## FACTS AND CIRCUMSTANCES

6. Since October 2011, the Affiant has been investigating anti-competitive activity, in violation of 15 U.S.C. § 1, in the automobile anti-vibration rubber parts industry. Through interviews, documents, and a consensually-monitored telephone call, the Affiant believes that there is probable cause to believe that Hiroshi Yoshida ("Yoshida") has violated 15 U.S.C. § 1 by conspiring to fix prices, rig bids, and allocate orders for automobile parts sold to American Honda Motor Co., Inc. ("Honda"), in restraint of interstate and foreign commerce.

7. Honda has automobile manufacturing and assembly facilities in various states, including Ohio, where it has facilities in Marysville, East Liberty and Anna. Honda often purchases parts from its suppliers by issuing Requests for Quotation ("RFQs"). Suppliers interested in receiving parts orders submit price quotes in response to the RFQs. During the period from in or around 2003 through in or around 2009, Honda issued to its suppliers RFQs for anti-vibration rubber parts. as the

8. Yoshida is currently employed by ███████, which is located in ███████ in the Southern District of Ohio, and is a wholly-owned U.S. subsidiary of the Japanese company ███████. From 1997 to 2003, Yoshida worked for ███; from 2003 until August 2011, Yoshida worked for ███ in the ███████ office



2

3:12 MJ 7045

in Japan; and from August 2011 until the present, Yoshida has worked for ▮▮▮. Both ▮▮▮ and ▮▮▮ sell automobile anti-vibration rubber parts to Honda. *in the ▮▮▮ office.* @ 06/15/12

9. CW-1 and CW-2 are employees of a company based in Japan that produces anti-vibration rubber products for automobiles and also sells such products to Honda, in competition with ▮▮▮. This company has a wholly-owned U.S. subsidiary located in the Northern District of Ohio. (This company and its U.S. subsidiary will be referred to herein collectively as "Company A".). Company A self-reported its anti-competitive activities to the DOJ and is cooperating with the investigation. The DOJ has a leniency program that allows the first member of a conspiracy that self-reports to avoid prosecution of the company and its employees. In order to qualify for the leniency program, an applicant must satisfy certain conditions, including cooperation. Company A has applied for and has received conditional admission into the DOJ's leniency program, as well as a similar leniency program in Japan. Assuming Company A receives full admission into the leniency program, CW-1 and CW-2 would be admitted as well and would avoid prosecution for their conduct.

10. On November 16, 2011, the Affiant, along with attorneys from the DOJ, interviewed CW-1 in the presence of his/her attorneys and with the aid of an interpreter provided by Company A. Below is a summary of some of the information provided by CW-1 in the course of the interview:

In late 2003 or early 2004, CW-1 discussed over the telephone with Yoshida their companies' price quotes to Honda for anti-vibration rubber parts for the 2006 model Honda Civic. They agreed not to lower their prices in response to requests from Honda, and not to lower their prices to obtain greater market share, unless they were able to provide to each other an engineering reason for the lower price. This market allocation

3

@

and pricing agreement reduced price competition for 2006 Honda Civic parts sold in the United States to Honda by ▇▇▇ and by Company A.

In 2008, CW-1 met with Yoshida in Japan regarding their companies' planned responses to Honda's RFQ for anti-vibration rubber parts for the 2011 model Honda Civic. (The 2007 through 2010 models used the same parts as the 2006 model.) They again agreed not to lower their prices without an engineering reason, and agreed that they would try to maintain their existing market shares for the Civic. Several months later, CW-1 and Yoshida exchanged their companies' approximate bid prices for each component over the telephone, and committed to submitting these prices to Honda. This market-allocation and pricing agreement reduced price competition for 2011 Honda Civic parts sold in the United States to Honda by ▇▇▇ and by Company A.

In 2009, CW-1 had a discussion with Yoshida over the telephone regarding their companies' price quotes to Honda for anti-vibration rubber parts for the 2012 model Honda CR-V. CW-1 and Yoshida again agreed to try to maintain their existing market shares. To effectuate their agreement, they again shared their approximate bid prices with each other and committed to submitting those prices to Honda. This market-allocation and pricing agreement reduced price competition for 2012 Honda CR-V parts sold in the United States to Honda by ▇▇▇ and by Company A.

11. CW-2 supervised CW-1 during a portion of the time period in which CW-1 had discussions with Yoshida. As a result, CW-2 became acquainted with Yoshida. On May 30, 2012, CW-2 conducted a consensually monitored telephone call with Yoshida. I observed the telephone call, which was conducted in Japanese, and have reviewed a translated draft transcript of the recording of the telephone call. Based on my review, I summarize certain parts of the

3:12 MJ 7045

draft transcript below:

    Yoshida acknowledged that he and employees of Company A had met at various locations in Japan for discussions. He explained that at one of these meetings they reached an agreement that allowed ▆▆▆▆ and Company A to decide what parts they "put in" (i.e., who would win the order), rather than allowing Honda to decide.

    Yoshida described the agreement for the Honda Civic as "Let's not stick out our hands to take each other's business." Yoshida further described the implementation of this agreement as representatives of the companies telling each other at what price they would submit bids, and then requesting that the other submit a higher price, so that the higher bidder would not win the business.

    Yoshida informed CW-2 that he would like to continue making these arrangements between the two companies, but that Company A has refused to do so.

    Yoshida also stated that he would be going home to Japan less than a year after his arrival in August 2011, and that his recall to Japan had been decided at a management meeting because of an investigation by the JFTC (Japan's competition authority).

12.   I have reviewed a translation of an e-mail sent by Hiroshi Yoshida to CW-1 on April 24, 2009. In the body of the e-mail, Yoshida states that he is informing CW-1 of ▆▆▆▆ response, and expresses his willingness to resubmit prices for two parts for which instructions had been received from CW-1, but where lower prices were submitted due to poor communications. I have also reviewed a translation of the e-mail sent by CW-1 in response to Yoshida's e-mail of April 24, 2009. In the body of the e-mail, which is also dated April 24, 2009, CW-1 asks Yoshida if the price could be raised for one of the parts. In addition, I have reviewed a translation of an e-mail by CW-1 forwarding his/her e-mail in response to Yoshida to,

5

3:12 MJ 7045

among others, an employee of Company A who at the time worked at its office in the Northern District of Ohio. Attached to the e-mail, also dated April 24, 2009, is a chart containing prices identified as ▇▇▇ for various anti-vibration rubber parts for the 2011 Honda Civic, including the price of the part CW-1 asked Yoshida to raise. In the body of the e-mail, CW-1 informs the recipients of the pricing request made to Yoshida with respect to that part, and asks that Company A submit a slightly lower price for another part that is included in the chart.

13. On May 31, 2012, Special Agent Matthew Sante, along with an interpreter and an attorney from the DOJ, interviewed Yoshida at his home. Yoshida denied that he had contacts with Company A regarding the 2006 Honda Civic RFQ and denied that he had e-mailed pricing information to Company A. Yoshida admitted that, regarding the 2011 Honda Civic, there were discussions and an agreement between the companies not to reduce price quotes for anti-vibration rubber parts in the absence of a valid design change or engineering change. Yoshida further admitted that they agreed not to submit prices for the 2011 Honda Civic that would be strange, drastic, or unexplainable. Yoshida initially denied having conversations with Company A regarding the Honda CR-V, but later admitted that there could have been a similar agreement regarding the Honda CR-V.

14. Since the day of Yoshida's interview, the FBI has monitored international travel reservations containing his name, and no such reservations have been made as of noon eastern time on June 14, 2012.

15. There is probable cause to believe that the antitrust conspiracy affected interstate or foreign commerce, because (1) the illegal agreements were reached in Japan by two Japanese companies, and the proceeds of the offense would accrue to those companies; (2) the affected parts were manufactured in the United States or imported into the United States and sold to

3:12 MJ 7045

Honda in the United States; (3) Company A would obtain necessary input materials, such as rubber, from outside the state of Ohio; and (4) Honda assembled vehicles containing the affected parts and sold those vehicles in multiple states.

## SUMMARY AND CONCLUSION

16. Based upon the Affiant's training, experience, and the facts set forth in this Affidavit, the Affiant believes that there is probable cause to believe that Hiroshi Yoshida conspired to restrain trade or commerce among the several states or with foreign nations, in violation of Title 15, U.S.C., Section 1.

KEVIN M. BROWN
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION
CLEVELAND DIVISION

This and the preceding pages were sworn to and subscribed before me this 15th day of June, 2012.

Vernelis K. Armstrong
United States Magistrate Judge
Toledo, Ohio

7