1                   UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
2                         WESTERN DIVISION

3    UNITED STATES OF AMERICA,        Case No. 3:12-mj-7045
                                      Toledo, Ohio
4              Plaintiff,             Friday, August 10, 2012

5         vs.

6    HIROSHI YOSHIDA,

7              Defendant.

8

                     TRANSCRIPT OF PROCEEDINGS
9        BEFORE THE HONORABLE VERNELIS K. ARMSTRONG
              UNITED STATES MAGISTRATE JUDGE

10

11                       MOTION HEARING

12   APPEARANCES:

13   For the Government:        L. Heidi Manschreck, Esq.
                                Robert Jacobs, Esq.
14                              U.S. Department of Justice -
                                Antitrust Division - Chicago
15                              Suite 600
                                209 South LaSalle Street
16                              Chicago, Illinois  60604
                                (312) 353-6893
17                              (312) 353-7530

18                              and

19                              Ava Rotell Dustin
                                Assistant United States Attorney
20                              Northern District of Ohio
                                Four SeaGate, Suite 308
21                              Toledo, Ohio  43604
                                (419) 259-6376

22
     For the Defendant:         Stephen J. Squeri, Esq.
23                              Justin Letts, Esq.
                                Jones Day
24                              North Point
                                901 Lakeside Avenue
25                              Cleveland, Ohio  44114-1190
                                (216) 586-7237

          Lori A. Callahan, RMR-CRR        (330) 252-6022

DEFENDANT'S
EXHIBIT
A

```
 1       Also Present:              Interpreter (via telephone)
 2
         Court Reporter:            Lori Ann Callahan, RMR-CRR
 3                                  United States District Courthouse
                                    Room 568
 4                                  2 South Main Street
                                    Akron, Ohio  44308
 5                                  (330) 252-6022
 6
 7
 8
 9
10
11       Proceedings recorded by mechanical stenography from a
         digital audio recording; transcript produced by
12       computer-aided transcription.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Case: 3:12-mj-07045-VKA  Doc #: 24-1  Filed: 08/24/12  3 of 86.  PageID #: 200
Case: 3:12-mj-07045-VKA  Doc #: 19  Filed: 08/16/12  3 of 86.  PageID #: 91

3

1                    P R O C E E D I N G S

2                         - - -

3            THE COURT:  Good afternoon.  The case before the

4     court this afternoon -- thank you so much, David -- is the

5     United States of America versus Hiroshi Yoshida, Case

6     3:12-mj-7045.

7                 Is he okay?  Can you hear?  Can you hear?

8            THE INTERPRETER:  I can -- I can hear.

9            UNKNOWN SPEAKER:  Unless we plug the fingers in my

10    ear -- in our ear, because the English and Japanese are --

11           THE COURT:  Oh.

12           THE INTERPRETER:  I'm sorry, but I'm not able to

13    hear.  The interpreter is not able to hear whatever was just

14    said now.

15           THE COURT:  It was not intended to be heard.

16    You're fine.

17                 The case before the court is the case of

18    Mr. Hiroshi Yoshida, and the court would state the

19    appearances present in court this afternoon is a Ms. Heidi

20    Manschreck, Mr. Rob Jacobs and Ms. Ava Dustin, Supervisory

21    Assistant United States Attorney here in the Northern

22    District of Ohio on behalf of the government.

23                 And also present for the defendant is his counsel,

24    Mr. Stephen Squeri, together with his co-counsel, Mr. Justin

25    Letts.

1           Are the parties ready to proceed?

2           MR. SQUERI:  We are, Your Honor.

3           THE COURT:  Government ready to proceed?

4           MS. MANSCHRECK:  We are, Your Honor.

5           THE COURT:  All right.  Thank you.

6           MS. DUSTIN:  Your Honor, I would note for the

7    record that I am not making an appearance in the case.  I am

8    just here as an advisory for the attorneys that are

9    representing --

10          THE INTERPRETER:  I'm sorry, Your Honor.  I am not

11   able to hear anything.

12          THE COURT:  I'll repeat that.  Ms. Ava Dustin

13   stated that she is not making an appearance in this case,

14   she is just here in an advisory capacity with counsel Heidi

15   Manschreck and Rob Jacobs.

16          Did you understand that?

17          THE INTERPRETER:  I can't hear very well.

18          THE COURT:  The court should also note that

19   Mr. Mark Miller of pretrial services is present for the

20   hearing today.

21          We are here today upon the defendant's motion to

22   modify conditions of pretrial release.  The defendant,

23   Mr. Hiroshi Yoshida, was charged in a criminal complaint

24   that was filed on June 15th of 2012, with a charge of

25   conspiracy in restraint of trade or commerce, in violation

Case: 3:12-mj-07045-VKA  Doc #: 24-1  Filed: 08/24/12  5 of 86.  PageID #: 202
Case: 3:12-mj-07045-VKA  Doc #: 19  Filed: 08/16/12  5 of 86.  PageID #: 93

5

1   of Title 15 of the United States Code, Section 1.

2           Mr. Yoshida has been released upon bond subject to

3   conditions.

4           We are here today to address those conditions and

5   defendant's motion to modify conditions of pretrial release.

6           Mr. Squeri, would you like to go forward?

7           MR. SQUERI:  Yes, Your Honor.  Thank you very --

8   thank you very much for taking the time to conduct this

9   hearing for us today.

10          As -- as you indicated, I'm here today accompanied

11  also by my co-counsel, Justin Letts of our firm.  I

12  understand now we do have an interpreter available for our

13  motion.  This is a continuation of a hearing that we

14  originally had set on July 26th.

15          Your Honor, I have the privilege of representing

16  my client, Hiroshi Yoshida, who is a citizen of Japan, who

17  works at a Japanese-owned company that has established

18  manufacturing operations here in the United States, an

19  operation that is employing about 500 people.

20          As I mentioned when we met last time, we intend to

21  at least call one witness, Special Agent Kevin Brown.  And I

22  expect he will be the only witness that we call.

23          THE INTERPRETER:  I'm sorry, Your Honor.  I really

24  apologize, but I'm not able to hear the counsel well, so --

25          THE COURT:  Did you hear anything that he said?

Case: 3:12-mj-07045-VKA  Doc #: 24-1  Filed: 08/24/12  6 of 86.  PageID #: 203
Case: 3:12-mj-07045-VKA  Doc #: 19  Filed: 08/16/12  6 of 86.  PageID #: 94

6

```
 1              THE INTERPRETER:  I did hear it, but I'm not
 2    hearing like some of the words.  So if he can speak into the
 3    microphone or some other way, because I'm not able to hear
 4    the entirety of his argument.
 5              MR. SQUERI:  Okay.  I will try.  Is that better?
 6              THE INTERPRETER:  That's much better.  Thank you
 7    very much.
 8              MR. SQUERI:  Okay.  I will try to speak more
 9    directly --
10              THE INTERPRETER:  Thank you.
11              MR. SQUERI:  -- into the microphone.
12              As I mentioned, Your Honor, beyond Special Agent
13    Kevin Brown, we do not intend to call any other witnesses,
14    but we do plan to proffer certain additional information for
15    the court's consideration after we do call Agent Brown.
16              Before we do call Agent Brown to the stand, please
17    allow me to just briefly summarize our position and why we
18    believe the facts here support and justify the change in the
19    conditions here, that is, the removal of the electronic
20    monitoring.
21              We intend, among other things, Your Honor, to show
22    that the release condition of electronic monitoring here is
23    unnecessary in this case, and that it is extraordinary to
24    require it in a case of this nature.
25              As DOJ has acknowledged, and as we've previously
```

Case: 3:12-mj-07045-VKA  Doc #: 24-1  Filed:  08/24/12  7 of 86.  PageID #: 204
Case: 3:12-mj-07045-VKA  Doc #: 19  Filed:  08/16/12  7 of 86.  PageID #: 95

7

1    discussed with the court, one of the premises for imposing

2    the condition on Mr. Yoshida has proved to be incorrect.

3    But our arguments go well beyond that.

4            And it is important to note, as the court may give

5    a certain amount of deference, we understand, to the earlier

6    decision of the magistrate judge in Columbus, that there was

7    not a full opportunity to vet the relevant considerations on

8    the day of Mr. Yoshida's arrest.

9            I would just observe, first of all, prior to that

10   day, Mr. Yoshida was not represented by counsel, which is

11   not surprising given that DOJ had not issued a target letter

12   at that point in time.

13           So as his counsel, we were very limited on that

14   day in what we could say or do.  DOJ had had its own

15   substantial responsi- -- opportunity to conduct this

16   investigation over a period of many months, while there was

17   essentially nothing that we knew about this investigation

18   until the day Mr. Yoshida was arrested.

19           And I need to add that that needs to be considered

20   in light of the fact that this is in no sense a

21   garden-variety case.  It is an antitrust case with

22   international implications.  The issues and the context,

23   therefore, are necessarily more complex.

24           And this was true not just for counsel on that

25   day, but also for the magistrate judge before whom

Case: 3:12-mj-07045-VKA  Doc #: 24-1  Filed:  08/24/12  8 of 86.  PageID #: 205
Case: 3:12-mj-07045-VKA  Doc #: 19  Filed:  08/16/12  8 of 86.  PageID #: 96

8

1    Mr. Yoshida was brought when he was arrested.  This was not

2    a typical criminal prosecution.  And the knowledge of the

3    nuances with this pros- -- associated with this prosecution

4    were known only by DOJ at that time.

5           So I would ask the court, while giving the earlier

6    ruling appropriate deference, to recognize that this is

7    really the first opportunity that we have to fully vet the

8    issues as to whether or not it is appropriate to impose

9    these conditions of release.

10          Your Honor, we also intend to do more than talk

11   about the mistake rooted in the incorrect translation of the

12   telephone conversation described in the affidavit submitted

13   by DOJ.

14          We would also intend to show that DOJ has

15   attempted to paint a picture of our client that is not

16   consistent with the evidence.

17          Mr. Yoshida is a respected businessman.  He is now

18   entering into the second year of his second tour of duty

19   here in the United States.  He previously worked here in the

20   United States for five years, from 1998 until -- until 2003,

21   and always conducted himself in compliance with U.S. law

22   while in this country.

23          He has roots in our community in that he works for

24   a company with substantial operations here in Ohio.  I

25   mentioned before that this was -- these are manufacturing

Lori A. Callahan, RMR-CRR        (330) 252-6022

Case: 3:12-mj-07045-VKA  Doc #: 24-1  Filed:  08/24/12  9 of 86.  PageID #: 206
Case: 3:12-mj-07045-VKA  Doc #: 19  Filed:  08/16/12  9 of 86.  PageID #: 97

9

1    operations that employ approximately 500 people here in the

2    United States.

3              And he has worked for the same -- this same

4    company, its parent company, for more than 30 years, his

5    entire career, since he graduated from college.

6              Your Honor, Mr. Yoshida is prepared to answer the

7    criminal charges the U.S. says -- United States says that

8    they intend to bring against him, consistent with the laws

9    of our country.  And he is not going to leave this country

10   while those charges are pending.  And his employer expects

11   him to act accordingly.

12             And contrary to the suggestion of DOJ, there is no

13   real practical incentive for his employer to send him back

14   to Japan.  In fact, it's to the contrary.

15             DOJ's opposition to our motion relies, among other

16   things, on the weight of the evidence.  And let me be clear,

17   and I am in part responding to a specific statement made in

18   DOJ's papers, we are in no sense conceding what is stated in

19   the government's affidavit.  We do not agree with the

20   government's statement regarding the weight of the evidence,

21   or statements about Mr. Yoshida's present willingness to

22   somehow violate United States antitrust laws.

23             We believe as well that the government has grossly

24   overstated the risk of flight.  In fact, the government's

25   arguments in this respect are based upon inaccurate

Case: 3:12-mj-07045-VKA  Doc #: 24-1  Filed:  08/24/12  10 of 86.  PageID #: 207
Case: 3:12-mj-07045-VKA  Doc #: 19  Filed:  08/16/12  10 of 86.  PageID #: 98

10

1    premises.

2              With that, Your Honor, I would first proceed,

3    before getting to the rest of my argument and the proffering

4    of evidence, to call Special Agent Kevin Brown to the stand.

5              THE COURT:  Thank you.  Ms. Manschreck, do you

6    wish to make any statement at this time?

7              MS. MANSCHRECK:  Your Honor, if you don't mind, I

8    would like to respond to some of the arguments that have

9    been made before the witness is put on.

10             THE COURT:  Do you have any objections to the

11   witness that you want to state at this time as well?

12             MS. MANSCHRECK:  Yes.  And also, I would state for

13   the record that the government does object to the calling of

14   this witness at this point.

15             We do not believe that this witness has relevant

16   information for the issue of the bond modification that is

17   the subject of this hearing.

18             THE COURT:  And would you like to state a response

19   to Mr. Squeri at this time?  You certainly may do so.

20             MS. MANSCHRECK:  Actually, Your Honor, I can wait

21   for that until afterwards.

22             THE COURT:  All right.  The court is aware of your

23   objection and the court has considered it and decided to

24   overrule your objection and permit Special Agent Brown to

25   testify on a limited basis, reminding Mr. Squeri that this

1    is a detention hearing, not a preliminary hearing or a

2    discovery hearing.  This is merely a bond hearing.

3           And when I say "merely," I don't mean that it's

4    not important, it's a very important hearing.  But the

5    nature of the hearing is bond as opposed to probable cause

6    hearing.

7           And I'd direct you to keep that in mind as you

8    question Special Agent Brown.

9           MR. SQUERI:  Sure.  Sure, Your Honor.  As I

10   mentioned in chambers, our inquiry into the merits will be

11   relatively limited and is intended to directly respond to

12   the government's assertions on page 5 of its brief.

13          THE COURT:  All right.  Thank you.

14          Agent Brown, would you please come forward and be

15   sworn?

16          KEVIN BROWN, of lawful age, a witness called by

17   the United States, being first duly sworn, was examined and

18   testified as follows:

19          THE CLERK:  Have a seat.

20          THE COURT:  You may be seated.

21          THE WITNESS:  Thank you.

22          THE COURT:  You may proceed, Mr. Squeri.

23          MR. SQUERI:  Thank you, Your Honor.

24                 DIRECT EXAMINATION OF KEVIN BROWN

25   BY MR. SQUERI:

1    Q.   Please state your name for the record.

2    A.   Kevin Brown.

3    Q.   And, Mr. Brown, are you a special agent with the FBI's

4    Cleveland division?

5    A.   Yes, I am.

6    Q.   And is it true that you have been assigned to an

7    investigation involving alleged collusion involving the sale

8    of anti-vibration rubber parts?

9    A.   Yes.

10   Q.   And your assignment to this investigation that involves

11   this case began in approximately October of 2011; is that

12   correct?

13   A.   Yes.

14   Q.   And, Special Agent Brown, did you sign an affidavit in

15   support of a criminal complaint issued in the case here

16   against Hiroshida -- Hiroshi Yoshida, which is the case that

17   we are here on today?

18   A.   Yes, I did.

19   Q.   And do you have a copy of that affidavit with you?

20   A.   No, I do not.

21           MR. SQUERI:  Your Honor, may I hand the witness a

22   copy of the affidavit?

23           THE COURT:  You may.  You may.

24           MR. SQUERI:  I have a -- Your Honor, I have a copy

25   for the court, too.  I assume the government has it.  You

           Lori A. Callahan, RMR-CRR          (330) 252-6022

1       have it?  Okay.

2               Thank you.

3               THE COURT:  And the court would note for the

4       record that the interpreter has a copy of the affidavit.

5               MR. SQUERI:  Oh.  Thank you, Your Honor.

6       BY MR. SQUERI:

7        Q.  Agent Brown, you understand that the sworn statements

8       made by you in this affidavit have also been relied upon

9       here by the United States on the issue of what conditions of

10      release ought to be maintained with respect to Mr. Yoshida?

11       A.  I'm sorry, I --

12              MS. MANSCHRECK:  Objection.  I don't believe --

13              THE COURT:  Sustained.  You don't know what --

14      that's an improper question.  You don't know what he knows

15      the government relied upon.

16      BY MR. SQUERI:

17       Q.  Well, Agent, have you, in fact, participated in

18      formulating the positions taken here by the United States

19      with respect to the conditions of release that have been

20      established with respect to Mr. Yoshida?

21              MS. MANSCHRECK:  Objection.  That's a legal

22      question.

23              THE COURT:  Sustained.

24      BY MR. SQUERI:

25       Q.  In any event, you understand that the purpose of this

                    Lori A. Callahan, RMR-CRR        (330) 252-6022

14

1    hearing today is to determine whether the conditions imposed

2    with respect to Mr. Yoshida ought to be modified, that is,

3    the conditions that relate to his electronic monitoring?

4    A.   Yes.

5    Q.   Agent Brown, the investigation leading to this

6    complaint was being conducted as a result of information

7    supplied by an applicant under the U.S. Justice Department's

8    Antitrust Division's leniency program; is that correct?

9    A.   Yes.

10   Q.   And this program is also called an amnesty program; is

11   that correct?

12   A.   Yes.

13   Q.   And that's because it doesn't only provide leniency for

14   companies that take advantage of it, but also provides

15   amnesty from a corporate applicant, that is,

16   non-prosecution?

17          MS. MANSCHRECK:  Objection.  No basis for that.

18          MR. SQUERI:  It's in his declaration -- it's in

19   his affidavit, Your Honor.

20          THE COURT:  It's my understanding it was in the

21   affidavit.

22          MS. MANSCHRECK:  My objection is that the agent

23   has no basis for explaining why it might be called the

24   amnesty program versus the leniency program.

25          THE COURT:  All right.  Sustained to that extent.

1    BY MR. SQUERI:

2    Q.  You are aware of the fact that the program provides for

3    more than leniency, but, in fact, provides for

4    non-prosecution; isn't that correct?

5    A.  Under certain conditions, yes.

6    Q.  And it -- and it allows for non-prosecution also of

7    employees of a company that makes an amnesty application,

8    correct?

9    A.  Again, under certain conditions, that's my

10   understanding, yes.

11   Q.  And here, the leniency or amnesty applicant is ▉▉▉

12   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ is that correct?

13   A.  I believe we refer in the affidavit to the applicant as

14   Company A.

15   Q.  And that Company A also employed CW-1 and CW-2,

16   employees of -- who also have been granted some type of

17   leniency or applicant --

18           MS. MANSCHRECK:  Objection.  There's no basis to

19   conclude that those individuals have been granted leniency.

20           MR. SQUERI:  Either he knows or he doesn't know.

21           THE COURT:  He can answer --

22           MS. MANSCHRECK:  There is no factual basis for the

23   question.

24           THE COURT:  He can answer if he knows.

25           THE WITNESS:  Could you repeat your question,

1   please?

2   BY MR. SQUERI:

3       Q.  Yes, Agent.  Are you aware of the fact that CW-1 and

4   CW-2 are being allowed the benefit of non-prosecution under

5   the amnesty application filed by Company A, ██████████

6   ███████?

7       A.  I believe that they have the ability to fall under that

8   program as well, yes.  But where they stand in that program

9   right now, I do not know.

10      Q.  You don't know where they are in the process, but

11  non-prosecution is available to them, based upon your

12  understanding, correct?

13      A.  Under certain conditions, yes.

14      Q.  Agent Brown, are you aware of the fact that there are

15  many antitrust grand jury investigations and prosecutions

16  going on today in the United States?

17      A.  I'm aware that there are others certainly, yes.  How

18  many, I do not know.

19      Q.  You are not aware of the fact that, you know, at any

20  given point in time, there is an average of about a hundred

21  antitrust grand jury investigations going on in the United

22  States?

23      A.  No, I have no idea how many.

24      Q.  All right.  Are you aware of any other antitrust cases

25  involving individuals who are subject to those

1    investigations being -- where individuals have been

2    subjected to electronic monitoring as in the case of

3    Mr. Yoshida?

4              MS. MANSCHRECK:  Objection, Your Honor.  It's

5    really not relevant to this issue.

6              THE COURT:  Relevancy.  Sustained.

7              MR. SQUERI:  Your Honor, can I -- can I be heard

8    on that subject?

9              THE COURT:  Certainly.

10             MR. SQUERI:  This is an issue which we discussed

11    in chambers the last time we were here, and we had made the

12    assertion that at that time, that this was unusual, that

13    what -- for this kind of condition to be imposed.

14             THE INTERPRETER:  The interpreter is not able to

15    hear.

16             MR. SQUERI:  Okay.  I will speak -- I will speak

17    more directly into the microphone.

18             THE COURT:  Don't look at me, just --

19             MR. SQUERI:  Sorry.

20             Your Honor, when we met the last time in chambers,

21    we had discussed the fact that it was our position that this

22    was unusual, and the court asked us to substantiate that,

23    and we are trying to substantiate it.  We think it's -- we

24    think it's relevant.  It's an easy line of questioning.  And

25    either the witness knows things or he doesn't, and we can

1        move on and I can offer other evidence later on.

2                THE COURT:  Do you wish to respond,

3        Ms. Manschreck?

4                MS. MANSCHRECK:  Yes, Your Honor.  Whether it's

5        usual or not has no bearing on whether there's a risk of

6        flight for this particular defendant.  And the United States

7        continues to be of the position that it has absolutely no

8        relevance for this hearing.

9                It sounds to the United States as if the defendant

10       is attempting to question the tactics of the Department of

11       Justice here, which really are not at issue.

12               MR. SQUERI:  Your Honor, I would respectfully

13       disagree very strongly with the government here.  The fact

14       that -- that they typically do not take these kinds of

15       steps, or seek this kind of -- these kinds of conditions in

16       these cases I believe is highly relevant in us demonstrating

17       that this is an extraordinary condition for them to seek

18       under these circumstances.

19               THE COURT:  But is this the witness to obtain that

20       information from?  I don't think it's relevant in this

21       instance.

22               If you have statistics that you can pull from the

23       Department of Justice, I think that's one argument.  But I

24       don't think it's relevant here based on this witness.

25               MR. SQUERI:  I understand.  I mean, the witness

Case: 3:12-mj-07045-VKA  Doc #: 24-1  Filed:  08/24/12  19 of 86.  PageID #: 216
Case: 3:12-mj-07045-VKA  Doc #: 19  Filed:  08/16/12  19 of 86.  PageID #: 107

19

1    knows what he knows.  And he's part of the team.  And if he

2    considered -- if he knows whether or not what they've done

3    in other cases applies here, fine.  If he doesn't, he

4    doesn't know.

5            THE COURT:  The court reaffirms its earlier ruling

6    that it's irrelevant.

7    BY MR. SQUERI:

8    **Q.**  Agent Brown, at the time that you signed your

9    affidavit, you believed that there was a reference during

10   that phone conversation -- during the phone conversation

11   that's referred to in that affidavit, to a JFTC

12   investigation; is that correct?

13   **A.**  Yes.

14   **Q.**  And JFTC, just for the record, stands for Japan Fair

15   Trade Commission, correct?

16   **A.**  I'm not sure of the exact what it stands for, but I'm

17   aware that it's the Japanese version of the ant- -- similar

18   to antitrust, yes.

19   **Q.**  Yes.  And, in fact, it was your understanding at that

20   time that they had their own investigation going on with

21   respect to the same matters that are at issue in this case;

22   is that correct?

23            MS. MANSCHRECK:  Objection.  No basis.

24            MR. SQUERI:  Your Honor, he represented in his --

25            THE COURT:  I think it was set forth in the

1    affidavit.

2              MR. SQUERI:  Yes.

3              MS. MANSCHRECK:  Your Honor, there was nothing set

4    forth in the affidavit referring to our awareness of the

5    existence of a JFTC investigation of Mr. Yoshida.  And I

6    would point you, Your Honor, to --

7              MR. SQUERI:  I can rephrase the question if it's

8    specific as to Mr. Yoshida.

9              THE COURT:  All right.  Thank you.

10   BY MR. SQUERI:

11   Q.  You -- you are aware of the fact, are you not, that

12   there -- that ███████ went in as an amnesty applicant to the

13   Japan Fair Trade Commission with respect to these

14   allegations of collusion involving the sale of

15   anti-vibration rubber parts; is that correct?

16   A.  I'm sorry, repeat your question.  I was trying to read

17   at the same time.  I apologize.

18   Q.  No problem.  I'll repeat the question for you.

19        You were -- you are aware of the fact that the amnesty

20   applicant in this case ████████ has also made an amnesty

21   application to the Japan Fair Trade Commission; is that

22   correct?

23   A.  I was aware at the time of this affidavit that the

24   company that we referred to as Company A had also applied to

25   a similar program in Japan, yes.

1    Q.   Now, your affidavit suggested, based upon what you

2    understood was said during that phone conversation, that

3    Mr. Yoshida was somehow being transferred back to Japan

4    because of something related to a JFTC investigation; is

5    that correct?

6    A.   My understanding was that, yes, Mr. Yoshida was

7    potentially being transferred back to Japan because of, yes,

8    the JFTC in Japan.

9    Q.   But you came to learn that that understanding was in

10   error, correct?

11   A.   That's part of that -- the reason for his transfer was

12   different than what we had believed at the time of the

13   affidavit, yes; but not the fact that he was potentially

14   being transferred back to Japan.

15   Q.   Right.  And just to be clear, when you prepared and

16   signed your affidavit, you believed it to be accurate,

17   because that's what was found in a transcript created by an

18   interpreter working for the Department of Justice, correct?

19   A.   Correct.

20   Q.   And -- and that's what you had also been told by CW-2;

21   is that correct?

22              MS. MANSCHRECK:  Objection.  No basis.

23              THE COURT:  Sustained.

24   BY MR. SQUERI:

25   Q.   Were you told anything by CW-2 about any mention during

Lori A. Callahan, RMR-CRR        (330) 252-6022

22

1    that phone conversation about a JFTC investigation?

2    **A.**   I don't recall.

3    **Q.**   Did you attempt to confirm with him -- well, did you

4    debrief him following that phone conversation?

5    **A.**   Briefly, yes.

6    **Q.**   And did he or did he not mention the JFTC

7    investigation -- a JFTC investigation during -- let me

8    rephrase that.

9        Did he or did he not mention anything about the JFTC

10   during that debriefing?

11   **A.**   I don't recall if he mentioned JFTC or not during the

12   debriefing.

13   **Q.**   Did he make any mention of any agency in Japan?

14   **A.**   Not to my recollection during the debriefing, no.

15   **Q.**   At any point in time, did he ever make any mention of

16   the JFTC with respect to his conversation that he had with

17   Mr. Yoshida?

18   **A.**   I don't recall.

19   **Q.**   Did you attempt to verify with CW-2 whether or not any

20   statement had been made about the JFTC during this

21   conversation with Mr. Yoshida?

22   **A.**   At the time of the debriefing, I received simply a

23   brief overview of the call in general.  We did not get into

24   a lot of specifics.

25   **Q.**   Before you signed your affidavit, did you at any -- had

Lori A. Callahan, RMR-CRR        (330) 252-6022

1    you at any point in time discussed the subject of a JFTC

2    mentioned with CW-2?

3    **A.**  No.

4    **Q.**  And it's true, Agent Brown, that subsequent to the

5    tape-recorded phone conversation, you began monitoring

6    international flights to see whether or not Mr. Yoshida

7    planned to leave the country; is that correct?

8            MS. MANSCHRECK:  Objection.  Again, no basis.

9    Mr. -- the agent has not said that he personally was a

10   monitor.

11           THE COURT:  Will you rephrase your question?

12           MR. SQUERI:  I'll rephrase the question.

13   BY MR. SQUERI:

14   **Q.**  It is your understanding, Agent Brown, that subsequent

15   to that tape-recorded telephone conversation on May 30,

16   2012, that you or others within the United States Government

17   began monitoring international flights to see whether or not

18   Mr. Yoshida planned to leave the country?

19   **A.**  Essentially, yes.

20   **Q.**  And did you find any indication that Mr. Yoshida had

21   made such arrangements?

22   **A.**  No.

23   **Q.**  And the day after the phone conversation, that is, May

24   31, 2012, one of your colleagues, Special Agent Sante,

25   participated in an interview of Mr. Yoshida; is that

                    Lori A. Callahan, RMR-CRR    (330) 252-6022

1    correct?

2    **A.**  Yes.

3    **Q.**  And when Mr. Yoshida was interviewed, there was no

4    indication given that he was about to leave the United

5    States, was there?

6              MS. MANSCHRECK:  Objection.  Again, no basis.

7              MR. SQUERI:  All right.

8              THE COURT:  Sustained.

9    BY MR. SQUERI:

10   **Q.**  Agent, let me refer you to paragraph 13 of your

11   declaration.  Paragraph 13, you discuss the interview that

12   was conducted by Agent Sante of Mr. Yoshida on May 31, 2012;

13   is that correct?

14   **A.**  Yes.

15   **Q.**  And is it fair to say that at least as of the time that

16   you wrote this affidavit, you completed this affidavit, you

17   had no information that Mr. -- that Mr. Yoshida had

18   indicated anything about leaving the United States?

19             MS. MANSCHRECK:  Objection.  No basis.

20             THE COURT:  Will you rephrase your question?

21   BY MR. SQUERI:

22   **Q.**  Was anything -- strike that.

23        You received and were privy to a report concerning

24   Agent Sante's interview of Mr. Yoshida on May 31, 2012; is

25   that correct?

1    **A.**  Yes.

2    **Q.**  Based on that report, did you have any information

3    indicating that Mr. Yoshida was planning to leave the United

4    States?

5              MS. MANSCHRECK:  Objection.

6              THE COURT:  Overruled.

7              THE WITNESS:  I'm not aware of any information in

8    the report of that interview of Mr. Yoshida mentioning

9    international travel, no.

10   BY MR. SQUERI:

11   **Q.**  And isn't it true, Agent, that on that day, Mr. Yoshida

12   let the FBI and Justice Department into his home and agreed

13   to an interview that lasted for four and a half hours?

14   **A.**  I do not know how long the interview lasted.  But I am

15   aware that it occurred at his house, yes.

16   **Q.**  And it -- and it was an extensive interview, wasn't it?

17   **A.**  Again, I was not there for the interview.  I do not

18   know how long it lasted.

19   **Q.**  And you are aware of the fact that following that

20   interview, Mr. Yoshida -- the interview of himself,

21   Mr. Yoshida led the Justice Department and FBI to one of his

22   coworkers that they were interested in speaking to?

23             MS. MANSCHRECK:  Objection.  Basis.

24   BY MR. SQUERI:

25   **Q.**  If you're aware.

Case: 3:12-mj-07045-VKA  Doc #: 24-1  Filed: 08/24/12  26 of 86.  PageID #: 223
Case: 3:12-mj-07045-VKA  Doc #: 19  Filed: 08/16/12  26 of 86.  PageID #: 114

26

1              THE COURT:  Sustained.  You correct -- you amended

2     your question.

3              MR. SQUERI:  Yes.

4              THE COURT:  All right.

5     BY MR. SQUERI:

6     **Q.**  Were you aware of the fact that Mr. Yoshida led the

7     Justice Department and FBI to one of his coworkers that they

8     were interested in talking to on May 31, 2012?

9     **A.**  I was not aware of that, no.

10    **Q.**  Was one of his coworkers interviewed on that day as

11    well?

12    **A.**  Yes.

13    **Q.**  And were you aware of the fact that the company's

14    attorney, following -- let me back up a second.

15             On May 31st, 2012, grand jury subpoenas were also

16    served on Mr. Yoshida and his employer; is that correct?

17    **A.**  I think so.

18             MS. MANSCHRECK:  Objection.  Basis.

19             THE COURT:  Can you rephrase your question?

20    BY MR. SQUERI:

21    **Q.**  Are you aware of the fact that on May 31, 2012, grand

22    jury subpoenas were served on Mr. Yoshida and his employer

23    by -- and his employer here in the United States, on or

24    about May 31?

25    **A.**  I believe so, yes.

                    Lori A. Callahan, RMR-CRR        (330) 252-6022

1    Q.  And even after the service of those grand jury

2    subpoenas, you did not become aware of any indication that

3    Mr. Yoshida had made any travel arrangements to leave the

4    United States; is that correct?

5    A.  That's correct.

6    Q.  And were you aware that as of that point in time, the

7    company's attorney had told DOJ that it was not sending

8    people home who appeared to be subjects of the

9    investigation?

10            MS. MANSCHRECK:  Objection.  No basis.

11            THE COURT:  Sus- -- you asked was he aware?

12            MR. SQUERI:  Yes.

13            THE COURT:  Overruled.

14            THE WITNESS:  I'm sorry, could you repeat the

15    question?

16    BY MR. SQUERI:

17    Q.  Were you aware that the company's attorneys, that is,

18    the attorneys for Usa here in the United States told DOJ

19    that it was not sending people back to the Uni- -- back to

20    Japan who had been identified as subjects of the

21    investigation?

22            MS. MANSCHRECK:  Objection.  It assumes facts that

23    are not in the record, and that appear to be misstatements

24    of fact.

25            THE COURT:  Overruled.  I am going to let him

1    answer if he knows the answer.

2                THE WITNESS:  I was not aware.

3    BY MR. SQUERI:

4    Q.  Were you aware of any representations made by the

5    company's lawyers to DOJ regarding whether or not it was

6    sending people back to Japan?

7    A.  No, I was not.

8    Q.  Now, Agent Brown, let me refer you to page 5 of your

9    affidavit.

10       Do you see the summary there found in the first full

11   paragraphs that begin on that page that relate to certain

12   matters that you said were discussed during a phone

13   conversation involving CW-2 and Mr. Yoshida on May 30, 2012?

14   A.  The first full paragraph on the page?

15   Q.  Yes.

16                THE COURT:  What's the first word of the

17   paragraph?

18                MR. SQUERI:  Okay.  I'm going to refer him to

19   actually the third paragraph on that page, Your Honor, which

20   is referred to by the government.

21   BY MR. SQUERI:

22   Q.  It says, quote, "Yoshida informed CW-2 that he would

23   like to continue making these arrangements between the two

24   companies, but that Company A has refused to do so."  Closed

25   quote.

                Lori A. Callahan, RMR-CRR        (330) 252-6022

1          Do you see that?

2     A.   Yes.

3     Q.   That was included in your affidavit?

4     A.   Yes.

5     Q.   Just to be clear, that's not a quote that you took from

6     the transcript, it's your attempt to characterize or

7     paraphrase what was being said during that conversation; is

8     that correct?

9     A.   That's correct.

10     Q.   The government seems to be relying on this observation

11     by you to say somehow Mr. Yoshida is expressing a desire to

12     continue illegal conversations.

13          Other than what you heard in this phone conversation,

14     do you have any basis for believing that Mr. Yoshida was

15     presently engaged in any attempts to violate United States

16     law here in 2012?

17     A.   Other than the conversation in this telephone call, is

18     that what you said?

19     Q.   Yes, that's -- that's right.

20     A.   No, I do not have any other information that

21     Mr. Yoshida was trying to violate U.S. law in 2012.

22     Q.   And either in the last year or during the prior five

23     years in which he worked here in the United States, you

24     haven't identified any conduct on his part occurring here in

25     the United States relating to a violation of U.S. law?

1        MS. MANSCHRECK:  Objection, Your Honor.  Again, no

2   basis.

3        MR. SQUERI:  Your Honor, they've tried -- the

4   government has tried to paint a picture that my client was

5   somehow trying to initiate collusive conversations here in

6   the United States recently.  It's a completely false

7   premise.  It's not supported by what's in the transcript.

8   And I want to -- I'd like to explore whether or not there's

9   any basis whatsoever for the government to have made that

10  assertion.

11       THE COURT:  Do you want to respond?

12       MS. MANSCHRECK:  Your Honor, it's argumentative

13  and he's not presenting any alternative version of what was

14  said in that transcript other than what you have before you.

15  I don't -- I don't see any basis -- any factual basis for

16  contesting that particular claim.

17       THE COURT:  Overruled.  I'm going to let you

18  proceed.

19       MR. SQUERI:  Thank you.

20  BY MR. SQUERI:

21  Q.  Agent, do you recall the question I'd asked you?

22  A.  No, sir, I do not.

23  Q.  I'm going to have to remind myself for a moment.

24  A.  No problem.

25  Q.  Agent Brown, are you aware of any evidence that my

1    client, Mr. Yoshida, has attempted to engage in any

2    collusive conduct while here in the United States, either in

3    the past year or in the prior five-year period when he was

4    here in the country?

5    **A.**   I'm sorry, what -- the prior five-year period, what

6    time period are you speaking about?

7    **Q.**   I am speaking of 1997 to 2003, sir, just to be clear.

8    Sorry.

9    **A.**   So the time in the '90s and in 2012, is that the time

10   frame?  I'm sorry.

11   **Q.**   Yes.  Are you aware of any collusive conduct which

12   might be characterized as collusive conduct on his part

13   during any of the time that he was here in the United

14   States?

15             MS. MANSCHRECK:  Objection, Your Honor.  Number

16   one, it's a compound question.  It's difficult to answer

17   between this 1998 to 2003 period, and then the more recent

18   period.  The witness has already answered that the statement

19   from 2012 about a desire to continue those agreements had

20   been made.

21             The question should, at the very least, be broken

22   up.

23             THE COURT:  Can you do that?

24             MR. SQUERI:  I'll break the question down.

25             THE COURT:  Thank you.  Sustained.  Your objection

1       is sustained, and I ask you to break up the question.

2                   MR. SQUERI:  I will.

3       BY MR. SQUERI:

4         Q.  Agent Brown, are you aware of any activities on the

5       part of Mr. Yoshida, my client, over the past year, where he

6       has, in fact, attempted to engage in collusive conduct in

7       the United States?

8                   THE COURT:  And I believe you asked that question.

9                   MR. SQUERI:  I was trying -- I was trying to -- I

10      was just breaking it down.  I -- okay.

11                  THE COURT:  You can answer.

12                  THE WITNESS:  Okay.  Outside of this telephone

13      conversation that you referenced the first time, no, I am

14      not aware of any other information.

15      BY MR. SQUERI:

16        Q.  Let's go back to any other time when Mr. Yoshida was

17      here in the United States.

18                  MS. MANSCHRECK:  Objection.  Relevance.

19                  THE COURT:  Overruled.  I'm going to let him

20      answer that.

21                  THE WITNESS:  Which time?

22                  THE COURT:  1997 to 2003.

23      BY MR. SQUERI:

24        Q.  1990 -- yeah, 1997 or 1998 to 2003, or any other time

25      when he was here in the United States, are you aware of any

                    Lori A. Callahan, RMR-CRR        (330) 252-6022

1    conduct, and I'm excluding the last year to be -- to be

2    clear, are you aware of any conduct that Mr. Yoshida has

3    engaged in here in the United States in violation of U.S.

4    law?

5        And I'm excluding that last one-year period.  I'm not

6    trying to ask the same question again.

7    **A.**  I'm having a difficult time answering that question.

8    I'm aware of several traffic violations that Mr. Yoshida had

9    here in the United States.  And I don't want to assume that

10   you mean something other.

11   **Q.**  With the exception of traffic violations.

12   **A.**  Okay.  The time period 1998 to 2003, while he was here

13   in the United States, I cannot recall off the top of my head

14   without reviewing all of my documents that I -- that there

15   is any information of violation of law while he was here.

16   I'm sorry, that's the best I can do.

17   **Q.**  And going back to this phone call that Mr. Yoshida had

18   with CW-2 on May 30, 2012, that call did not come about upon

19   the initiative of Mr. Yoshida, did it?

20   **A.**  If your question is how the call started, CW-2 first

21   reached out to Mr. Yoshida.

22   **Q.**  And it was CW-2 who first brought up prior

23   conversations that had taken place in Japan during this

24   telephone conversation; isn't that correct?

25   **A.**  Without reviewing the draft transcript, I can't answer

Lori A. Callahan, RMR-CRR          (330) 252-6022

Case: 3:12-mj-07045-VKA  Doc #: 24-1  Filed: 08/24/12  34 of 86.  PageID #: 231
Case: 3:12-mj-07045-VKA  Doc #: 19  Filed:  08/16/12  34 of 86.  PageID #: 122

34

1    that question.

2    **Q.**  Well, is it fair to say that the conversations that

3    were referred to during this con- -- during this phone call

4    were all to have taken place in Japan, not the United

5    States?

6              MS. MANSCHRECK:  Objection.  Basis.

7              THE COURT:  Do you want to respond?

8              MR. SQUERI:  Your Honor, the witness has signed an

9    affidavit talking about what occurred during this call

10   he's -- he's attempted to summarize and characterize.  I

11   think it's appropriate cross-examination to ask him a

12   question of this nature.

13             THE COURT:  Overruled.  You can answer, if you

14   know.

15             THE WITNESS:  Your question again, sir?  I'm

16   sorry.

17   BY MR. SQUERI:

18   **Q.**  And the conversations that were referenced during this

19   telephone conversation on May 30, 2012 between Mr. Yoshida

20   and CW-2 were conversations that were to have taken place in

21   Japan, not the United States; is that correct?

22   **A.**  Again, without reviewing the draft transcripts, that's

23   difficult to answer, but I believe that that's correct, yes.

24   **Q.**  And the transcript, in some respects, speaks for

25   itself.  But you -- you cannot say here today whether or not

              Lori A. Callahan, RMR-CRR        (330) 252-6022

Case: 3:12-mj-07045-VKA  Doc #: 24-1  Filed:  08/24/12  35 of 86.  PageID #: 232
Case: 3:12-mj-07045-VKA  Doc #: 19  Filed:  08/16/12  35 of 86.  PageID #: 123

35

1    it was Mr. Yoshida who initiated any conversation about

2    those prior discussions in Japan?

3              MS. MANSCHRECK:  Objection.  Your Honor, I think

4    we're -- we're getting pretty far afield of the bond

5    modification issue.  It appears to me that counsel is

6    essentially arguing that because of -- he may be able to

7    show that conduct occurred in Japan that was nevertheless in

8    violation of the laws of the United States, and there's no

9    dispute regarding that.  We do seem to be getting quite far

10   afield of the issue of whether the defendant is going to

11   appear for future court hearings, and I'd respectfully

12   request that the examination be limited.

13             MR. SQUERI:  Your Honor, the government seems to

14   want to have its cake and eat it too.  They want to make

15   assertions in their brief suggesting that Mr. Yoshida was

16   somehow ready, able and willing to start engaging in

17   antitrust violations here in the United States, and the

18   record does not support that.

19             And I think it's -- it's certainly appropriate

20   cross-examination for this witness to see whether or not

21   there's any evidence that -- that they have that goes beyond

22   that point, that goes beyond what's in this conversation, or

23   whether or not he's aware of any initiative taken by my

24   client in this area.

25             THE COURT:  Can you simply ask him that question?

                    Lori A. Callahan, RMR-CRR       (330) 252-6022

Case: 3:12-mj-07045-VKA  Doc #: 24-1  Filed:  08/24/12  36 of 86.  PageID #: 233
Case: 3:12-mj-07045-VKA  Doc #: 19  Filed:  08/16/12  36 of 86.  PageID #: 124

36

1          MR. SQUERI:  Your Honor, I have been trying to ask

2     those questions, and we've had repeated objections from the

3     Department of Justice.  I did ask -- may I have the question

4     reread back?  Because I -- no?  Okay.

5          I'll rephrase the question, Your Honor --

6          THE COURT:  All right, thank you.

7          MR. SQUERI:  -- to help move things along.

8     BY MR. SQUERI:

9     Q.  Agent, are you aware of whether or not Mr. Yoshida

10    initiated with CW-2 any conversation about their prior

11    discussions in Japan?

12         MS. MANSCHRECK:  Objection, Your Honor.

13         THE COURT:  During -- can you limit that to a time

14    period?  What time period are we talking about?

15         MR. SQUERI:  During the phone conversation.

16         THE COURT:  All right.  Overruled.  You can

17    answer.

18         THE WITNESS:  I do not recall how the conversation

19    began, but I recall a conversation back and forth with both

20    parties, CW-2 and Mr. Yoshida discussing prior conversations

21    and meetings that they had about that behavior.

22    BY MR. SQUERI:

23    Q.  During that conversation, did Mr. Yoshida seek to

24    engage CW-2 in any conversation about pricing?

25    A.  Current pricing, is that your question?

Case: 3:12-mj-07045-VKA Doc #: 24-1 Filed: 08/24/12 37 of 86. PageID #: 234
Case: 3:12-mj-07045-VKA Doc #: 19 Filed: 08/16/12 37 of 86. PageID #: 125

37

1    **Q.** Yes.

2    **A.** Not to my knowledge, no.

3    **Q.** Did he attempt to enter into any type of collusive

4    agreement during that phone conversation?

5    **A.** Beyond his assertion that he would like to continue but

6    Company A would not allow it, I am not aware of any other

7    instance in the conversation, no.

8    **Q.** And there was a comment made in passing, he didn't ask

9    the person from CW-2 to engage in further collusive

10   conversations, did he?

11            MS. MANSCHRECK: Objection. Argumentative.

12            THE COURT: Overruled.

13            MS. MANSCHRECK: Objection. No basis.

14            THE COURT: Overruled. You can answer it.

15            MS. MANSCHRECK: Your Honor, the contention is

16   that the comment is made in passing. There is no basis in

17   this record upon which to assume that fact.

18            THE INTERPRETER: Interpreter is not able to hear

19   the prosecutor, Your Honor.

20            THE COURT: Oh. The court would agree with you

21   that there's no basis for determining whether or not the

22   comment was made in passing.

23            So can you rephrase your question?

24            MR. SQUERI: Sure, Your Honor.

25   BY MR. SQUERI:

              Lori A. Callahan, RMR-CRR       (330) 252-6022

1      **Q.**  Agent, did Mr. Yoshida, during that telephone

2      conversation, ask CW-2 to engage in any form of collusive

3      behavior?

4      **A.**  Mr. Yoshida -- again, without reviewing the draft

5      transcript in front of me here, Mr. Yoshida made a comment

6      about wanting to continue, but not being able to.

7           Beyond that comment, I am not aware of any other

8      instance of attempting to have collusive behavior during

9      that conversation.

10     **Q.**  And he didn't bring up prices, he didn't bring up

11     competition, he didn't bring up anything concerning the

12     business between those two companies, did he?

13          MS. MANSCHRECK:  Objection, Your Honor.  I think

14     counsel has made his point and it is cumulative.

15          THE COURT:  Sustained.

16     BY MR. SQUERI:

17     **Q.**  Agent Brown, do you see there on pages 3 and 4 of your

18     affidavit, you talk about certain contacts and

19     communications, you say, that DOJ has been told about

20     concerning requests for quotations made by Honda; is that

21     correct?

22     **A.**  One moment, please.  Let me review the tran- --

23     **Q.**  Please do that.

24     **A.**  Okay.  What was your question again?  I'm sorry.

25     **Q.**  If you look at pages 3 and 4 of your affidavit, you

                    Lori A. Callahan, RMR-CRR      (330) 252-6022

1    talk about certain contacts and communications that you say

2    DOJ has been told about concerning certain requests for

3    quotations made by Honda; is that correct?

4    **A.**  Yes.

5    **Q.**  Now, just to be clear, none of the communications you

6    were referring to are supposed to have taken place in the

7    United States; is that correct?

8    **A.**  I believe that is correct, yes.

9    **Q.**  All of these communications were to have taken place

10   within the sovereign territory of Japan; isn't that correct?

11           MS. MANSCHRECK:  Objection.  I think that counsel

12   would need to restate that and tie it at least to the

13   affidavit in order to have a basis for that.

14           MR. SQUERI:  Your Honor, I'm going to object.  I

15   mean, these repeated interruptions by DOJ with what I would

16   submit are in many cases frivolous and unnecessary

17   objections is --

18           THE COURT:  Overruled.  You may -- overruled.

19   BY MR. SQUERI:

20   **Q.**  And all of these communications that you refer to here

21   were to have taken place within the sovereign territory of

22   Japan; isn't that correct?

23   **A.**  I believe that's correct, yes.

24   **Q.**  And one of the things you disclose here in your

25   affidavit is that there was supposed to have been

1    discussions in which Mr. Yoshida was involved with CW-1

2    regarding the request for quotation for the 2006 Honda

3    Civic; is that correct?

4    **A.**  Yes.

5    **Q.**  Did you know that at that point in time, Mr. Yoshida

6    wasn't even employed in a position where he had

7    responsibility for Honda business and sales?

8              MS. MANSCHRECK:  Objection, Your Honor.  Again --

9              THE COURT:  Sustained.

10             MS. MANSCHRECK:  -- at this point we're going

11   far --

12             THE COURT:  Sustained.

13             MS. MANSCHRECK:  -- afield and --

14             THE COURT:  Sustained.

15   BY MR. SQUERI:

16   **Q.**  Okay.  Well, let me -- let me just ask this question:

17        Agent Brown, are -- you've been working on this

18   investigation.  Have you become familiar with the process

19   that's followed in connection with the Honda request for

20   quotation when it is looking to buy anti-vibration rubber

21   products?

22   **A.**  Generally speaking, yes.

23   **Q.**  And are you aware of the fact that there are various

24   stages in this process when both specifications for a

25   product and prices are changed and requoted?

1    **A.**  Yes.

2    **Q.**  And are you aware of the fact -- are you aware of

3    whether or not any prices that may or may not have been

4    discussed -- may have been discussed during any of these

5    conversations you allude to were actual prices that were

6    charged to Honda?

7              MS. MANSCHRECK:  Objection, Your Honor.  Again, if

8    the concern is about the weight of the evidence, at this

9    point this is going much further afield than that.  And as

10   we -- as has been discussed before, and as Your Honor noted

11   at the beginning of this hearing, this should be quite

12   limited to the issue of the bond modification hearing, and

13   counsel has taken a lot of liberties at this point.

14             THE COURT:  Sustained.

15             MR. SQUERI:  Your Honor, if you'll just allow me

16   just a little bit of latitude, and I'll be very -- I'll be

17   very brief here.

18   BY MR. SQUERI:

19   **Q.**  Are you aware of any analysis done by the United States

20   as to whether and to what extent United States commerce was

21   affected by any of the conduct that you refer to in -- in

22   your affidavit?

23             MS. MANSCHRECK:  Objection, Your Honor.

24             THE COURT:  Sustained.  I don't think that has any

25   bearing upon our detention issue.

                 Lori A. Callahan, RMR-CRR        (330) 252-6022

1    BY MR. SQUERI:

2    **Q.**  Agent Brown, are you aware of the fact that Mr. Yoshida

3    was required to surrender his passport when he was arrested

4    here -- when he was arrested in Columbus some 50 days ago;

5    is that correct?

6    **A.**  Yes.

7    **Q.**  And without this passport, he can't get on a plane and

8    travel back to Japan; isn't that correct?

9    **A.**  Without any passport, he cannot get on a plane to

10   travel back to Japan, that's correct.

11   **Q.**  Is it -- Agent Brown, are you -- do you have any

12   specific awareness of any black market that exists for

13   Japanese passports in the United States?

14   **A.**  Do I have personal knowledge of a black market?  No.

15   Am I aware that it's possible for foreign nationals to go to

16   an embassy and get a new passport?  Yes.

17   **Q.**  I'll get to that point in a second.

18   **A.**  Okay.

19   **Q.**  But just -- just to be clear, you have no information

20   or knowledge about a black market for passports, Japanese

21   passports here in the United States, do you?

22              THE COURT:  He already answered that.

23   BY MR. SQUERI:

24   **Q.**  Agent, have you informed any of the Japanese consulates

25   or the embassy about the fact that Mr. Yoshida's passport

1    was surrendered because of the pending criminal charges

2    against him?

3    **A.**  No, I have not.

4    **Q.**  Is there anything to prevent you from doing so?

5    **A.**  Not that I'm aware of, no.

6    **Q.**  Did you realize that if the United States Government

7    told the Japanese consulate about this and the embassies,

8    they wouldn't issue him a new passport --

9         MS. MANSCHRECK:  Objection.

10   BY MR. SQUERI:

11   **Q.**  -- if he applied for one?

12        MS. MANSCHRECK:  Objection.  That assumes a fact

13   that is not in the record.

14        MR. SQUERI:  Your Honor, I intend to proffer

15   evidence to show that that is, in fact, the case.  And I'd

16   just like to know -- the government here has taken the

17   position expressly in its brief that these conditions are

18   justified because my client can somehow easily go and obtain

19   a passport.  That is simply not accurate.

20        And I'd like to probe whether or not the

21   government does, in fact, have any -- any evidence to

22   support that fact.  And I think it's appropriate to ask him

23   whether or not he knows that such a passport can and cannot

24   be obtained from a consulate.

25        THE COURT:  You can ask him whether he knows.

         Lori A. Callahan, RMR-CRR        (330) 252-6022

44

1            THE WITNESS:  I'm sorry, could you rephrase your

2    question -- or repeat your question?

3    BY MR. SQUERI:

4    **Q.**  Do you know, Agent, whether or not a Japanese consulate

5    would issue a passport to Mr. Yoshida if it were told that

6    he was required to surrender that passport in connection

7    with a criminal proceeding like this?

8    **A.**  I do not know.

9    **Q.**  And you are aware of the fact that the Japanese and

10   United States antitrust authorities have established a

11   cooperative relationship when it comes to enforcing

12   competition in antitrust laws; isn't that correct?

13            MS. MANSCHRECK:  Objection, Your Honor.

14            THE COURT:  Sustained.

15   BY MR. SQUERI:

16   **Q.**  Are you aware of the fact that the United States has an

17   extradition treaty with Japan?

18   **A.**  Yes.

19            MR. SQUERI:  I have -- I have no further

20   questions, and I'd like to turn to the evidence that I

21   intend to proffer as well, Your Honor.

22            THE COURT:  Before I do so, I would give

23   Ms. Manschreck an opportunity to do any direct that she

24   chooses.

25            MS. MANSCHRECK:  Yes, Your Honor, I would.

            Lori A. Callahan, RMR-CRR        (330) 252-6022

```
 1                  CROSS-EXAMINATION OF KEVIN BROWN

 2    BY MS. MANSCHRECK:

 3     Q.  Good afternoon, Agent Brown.

 4     A.  Good afternoon.

 5              THE INTERPRETER:  Interpreter is not able to hear.

 6    Sorry.

 7              THE COURT:  Please speak directly into the

 8    microphone.

 9              MR. SQUERI:  You have to speak right into the

10    microphone there.

11    BY MS. MANSCHRECK:

12     Q.  Agent Brown, what is your educational background?

13     A.  I have a college degree in mathematics.

14     Q.  And I believe you said in your -- during direct

15    examination, that you're employed by the FBI in Cleveland;

16    is that correct?

17     A.  Yes.

18     Q.  And what is your title there?

19     A.  Special agent.

20     Q.  And how long have you worked at the FBI?

21     A.  Approximately ten years.

22     Q.  And what sort of investigations have you been involved

23    in at the FBI?

24     A.  White collar crime investigations, including antitrust,

25    public corruption, some bankruptcy fraud, and organized
```

1    crime matters as well.

2    **Q.**  And approximately how many investigations have you been

3    involved in over the course of those ten years?

4    **A.**  By that do you mean that I was the main case agent on?

5    **Q.**  That you had any investigative role in.

6    **A.**  I'm sorry, I have no idea.  A roundabout guess, I'd say

7    50 that I had some sort of involvement in.  That's the best

8    I can do sitting here.

9    **Q.**  And I believe you stated that you've been working on

10    this particular investigation since the fall of last year;

11    is that correct?

12    **A.**  That's correct.

13    **Q.**  And what sort of activities have you conducted in the

14    course of this investigation?

15    **A.**  Interviews, consensual monitoring of a telephone call,

16    grand jury subpoenas.

17    **Q.**  Can you understand Japanese?

18    **A.**  No.

19    **Q.**  And so when you're conducting these investigative

20    activities and they involve Japanese language, do you rely

21    on interpreters?

22    **A.**  Yes.

23    **Q.**  And with respect to the affidavit that was submitted

24    with the complaint in this case, does it reflect the

25    entirety of the information collected during your

1    investigation?

2    **A.**  No.

3    **Q.**  And is the investigation ongoing?

4    **A.**  Yes.

5    **Q.**  You had mentioned the recorded phone call on direct

6    examination.  When was that phone call made?

7    **A.**  I believe it was May 30th of 2012.  It's -- I'm sorry,

8    I'm just looking through the affidavit.

9         Yes, May 30th, 2012.

10   **Q.**  And were you present for the duration of the phone

11   call?

12   **A.**  Yes.

13   **Q.**  And what language was the phone call in?

14   **A.**  Japanese.

15   **Q.**  And the person who made the phone call, how -- how do

16   you know that person?

17   **A.**  The cooperating witness from Company A in this

18   investigation.

19   **Q.**  And is Company A a competitor with the defendant's

20   company?

21   **A.**  Yes.

22   **Q.**  And who is the phone call made to?

23   **A.**  Mr. Yoshida.

24   **Q.**  Could you understand what was going on while the call

25   was being made?

1   **A.**   No.

2   **Q.**   I believe you said on direct examination that there was

3   a debriefing after the phone call; is that correct?

4   **A.**   Yes.

5   **Q.**   And during that debriefing, did you have a chance to

6   talk to the caller about what had happened in the call?

7   **A.**   The CW-2?  Through the interpreter, yes.

8   **Q.**   And is the transcript that you relied on in support of

9   the affidavit in support of this complaint consistent with

10   what you heard during that debriefing?

11          MR. SQUERI:  Objection.  Leading.

12          THE COURT:  Sustained.

13   BY MS. MANSCHRECK:

14   **Q.**   You said before that what you heard during this

15   debriefing was a summary of what had happened during the

16   call; is that correct?

17   **A.**   A very general summary, yes.

18   **Q.**   Was there any mention in that debriefing about plans to

19   return to -- the defendant's plans to return to Japan?

20   **A.**   I don't recall.  There may have been mention of travel.

21   I don't recall if it was specific as to why he was

22   returning.  That's a -- I really don't recall.

23   **Q.**   So you don't recall whether there was mention of why

24   there would be a return, but there was mention of there

25   being a planned return?

                Lori A. Callahan, RMR-CRR       (330) 252-6022

Case: 3:12-mj-07045-VKA  Doc #: 24-1  Filed:  08/24/12  49 of 86.  PageID #: 246
Case: 3:12-mj-07045-VKA  Doc #: 19  Filed:  08/16/12  49 of 86.  PageID #: 137

49

1   **A.**   I'm -- I'm confident that there wasn't mention of why.

2   I'm not as confident as to whether or not he mentioned that

3   there would be travel.  I -- I believe he did.

4   **Q.**   Now, after the call was made, you were -- there was a

5   transcript prepared, correct?

6   **A.**   Of the call, yes.

7   **Q.**   And you've had a chance to review that transcript,

8   correct?

9   **A.**   Yes.

10   **Q.**   Is that transcript consistent with what was said to you

11   by the caller in that debriefing?

12           MR. SQUERI:  Objection, Your Honor.  Asked and --

13   previously asked and sustained.  Leading.

14           THE COURT:  Sustained.

15   BY MS. MANSCHRECK:

16   **Q.**   Was there anything that was said in the debriefing that

17   is inconsistent with what you saw in the transcript?

18   **A.**   No, the debriefing was very general.  The transcript is

19   obviously much more detailed.

20   **Q.**   Are you aware of the citizenship of the defendant?

21   **A.**   Yes.  Japanese.  A citizen of Japan.

22   **Q.**   And are you aware whether he has any family members?

23   **A.**   I believe he does, yes.  I believe he's married.

24   **Q.**   Are you aware where his wife resides?

25   **A.**   My understanding is it's in Japan.

1          MR. SQUERI:  Objection.  Foundation.

2          THE COURT:  Sustained.

3          MS. MANSCHRECK:  Your Honor, I'm just asking the

4    witness what he's aware of, where his -- whether he's aware

5    where the wife resides.

6          MR. SQUERI:  Same objection.  No foundation that

7    he would have a basis for personal knowledge.

8          THE COURT:  Do you want to rephrase your question?

9    BY MS. MANSCHRECK:

10   **Q.**  In the course of this investigation, have you had a

11   chance to review visa documentation associated with this

12   defendant?

13   **A.**  Yes.

14   **Q.**  And according to that visa documentation, is it your

15   understanding that the defendant was -- came to the United

16   States with his wife?

17   **A.**  I'm sorry.

18   **Q.**  And I'll rephrase.

19          Are you aware of more than one visit by the Uni- -- by

20   the defendant to the United States?

21   **A.**  Yes.

22   **Q.**  And one of those visits, I believe on direct

23   examination we discussed was between 1998 and 2003; is that

24   correct?

25   **A.**  Yes.

                 Lori A. Callahan, RMR-CRR          (330) 252-6022

Case: 3:12-mj-07045-VKA  Doc #: 24-1  Filed:  08/24/12  51 of 86.  PageID #: 248
Case: 3:12-mj-07045-VKA  Doc #: 19  Filed:  08/16/12  51 of 86.  PageID #: 139

51

1    Q.  And the other is the one that has him here now from --

2    that started in August of 2011; is that correct?

3    A.  Correct.

4    Q.  With respect to the visit in 1998 through 2003, did you

5    have a chance to review the visa documentation associated

6    with that visit?

7    A.  Yes.

8    Q.  And according to that visa documentation, are you aware

9    whether the defendant brought his wife with him for that

10   visit?

11           MR. SQUERI:  Objection.  Leading.  If they have

12   the documentation, they can -- they can show it to us.  It's

13   putting witness in the -- words in the witness's mouth as to

14   what's included in another document.

15           THE COURT:  Overruled.

16           THE WITNESS:  I do not recall.

17   BY MS. MANSCHRECK:

18   Q.  And with respect to his more recent visit in August of

19   2011, do you recall any information about whether he was --

20   he brought his wife to the United States?

21   A.  I don't believe he did.

22   Q.  You do not believe he brought his wife to the United

23   States, or you do not believe he provided that information?

24   A.  My fault.  I do not believe his wife traveled with him.

25   Q.  Are you aware of where the defendant's permanent

1    residence is?

2    **A.**  In the United States or in Japan, is that -- is that

3    what you mean?

4    **Q.**  Well, that's the question, is where his -- are you

5    aware of where his permanent residence is?

6    **A.**  Yes, Japan.

7    **Q.**  Are you aware of whether the defendant owns any housing

8    in the United States?

9    **A.**  I am not aware.

10   **Q.**  Are you aware of who owns the housing that the

11   defendant currently resides in in the United States?

12   **A.**  I believe it's his employer.

13   **Q.**  On direct examination, Mr. Squeri had asked you some

14   questions regarding the am- -- the leniency program with the

15   Antitrust Division.

16       You had mentioned on direct examination that there are

17   certain conditions that are required for a leniency

18   applicant to receive non-prosecution.

19       Could you explain what some of those conditions are?

20   **A.**  Um --

21           MR. SQUERI:  Objection.  Foundation.  The

22   government previously questioned this witness's competence

23   to get into this area.  It seems unfair for them now to lead

24   him along in another line of questioning.

25           THE COURT:  I think we're going far afield here

1      again, so I'll sustain the objection.

2      BY MS. MANSCHRECK:

3        Q.  Is it your understanding that in order to receive

4      non-prosecution according to the leniency program's terms,

5      one would have to provide truthful cooperation?

6                  MR. SQUERI:  Objection.

7                  THE COURT:  Sustained.

8      BY MS. MANSCHRECK:

9        Q.  Are you aware of prosecutions of companies by the

10     Antitrust Division?

11       A.  Any prosecution of any company?

12       Q.  Yes.

13       A.  Yes.

14       Q.  And is it your understanding that based on the facts

15     alleged in your affidavit, the defendant's company could

16     potentially be prosecuted?

17       A.  Yes.

18       Q.  Do you recall what, if any, monitoring of the

19     defendant's travel plans were in effect prior to the

20     issuance of the complaint and the arrest warrant?

21       A.  Yes.

22       Q.  Could you describe for the court how that monitoring

23     works?

24       A.  Prior to the arrest warrant, my understanding with

25     assistant with other agents -- assistance from other agents

1    was that a representative from another government agency

2    essentially checked international reservations each day to

3    see if Mr. Yoshida had made any.

4      Q.  How frequently during a day would those reservations be

5    checked?

6      A.  My understanding was once.

7      Q.  Is it your understanding that if those reservations

8    were checked, for example, early in the day, and the

9    defendant then purchased a ticket later in the day, you

10   would not have been alerted of that reservation?

11            MR. SQUERI:  Objection, Your Honor.  Calls for

12   speculation.  No foundation.  There's no evidence that there

13   would have been anything of the kind done here, and it's

14   just asking the witness to speculate about something that is

15   purely argumentative.

16            MS. MANSCHRECK:  Your Honor, the foundation is

17   laid by the witness's testimony that it's only checked once

18   a day.

19            THE COURT:  Overruled.

20            THE WITNESS:  I'm sorry, could you repeat your

21   question?

22   BY MS. MANSCHRECK:

23     Q.  Is it your understanding that were the reservations

24   checked early in a day and the defendant were to later in

25   the day purchase a ticket for travel outside the United

1    States, that you would not be alerted to that, assuming that

2    it was for same-day travel?

3    **A.**  My understanding --

4         MR. SQUERI:  Objection.  Foundation as to whether

5    or not the witness knows that could be picked up in the --

6    in the check of reservations.  I -- we need to have some

7    foundation that he's in the position to even know that.

8         THE COURT:  Sustained.

9    BY MS. MANSCHRECK:

10   **Q.**  Is it your understanding that the monitoring system

11   that we have been discussing is foolproof?

12   **A.**  By "foolproof," you mean -- if you mean 100 percent

13   accurate all the time, no, it's not.

14   **Q.**  And can you explain an example of how it's not accurate

15   100 percent of the time?

16   **A.**  Through my conversation with agents that we have

17   stationed at various airports throughout the country, I

18   contacted one of them, and their -- based on different --

19   obviously, different circumstances; in this case, we asked,

20   we, the FBI, the agent that I contacted, Customs and Border

21   Patrol, I believe it was, to access one of their systems to

22   check for international flight reservations by Mr. Yoshida.

23       My understanding is that that was done approximately

24   once a day, at best.  And if reservations were made early

25   and he traveled out later that day, again, my understanding

1    is it would not have been picked up by the system until the

2    following day when they checked again.

3     Q.   And similarly, if the defendant were to travel to

4    Mexico or to Canada by car, is it your understanding that

5    law enforcement would receive notification in time to

6    intercede?

7              MR. SQUERI:  Objection.  Foundation.

8              THE COURT:  Sustained.

9    BY MS. MANSCHRECK:

10    Q.   In your conversations with other agents and with border

11   patrol, have you become familiar with any system in place

12   with respect to the borders with Mexico and Canada?

13    A.   Yes.  My conversations were with another FBI agent, not

14   Customs and Border Patrol.

15    Q.   And based on that conversation and -- what is your

16   understanding as far as notifications that would be in place

17   in the event that the defendant were to travel to either

18   Mexico or to Canada?

19    A.   Are you referring to land crossings?

20    Q.   Yes.

21    A.   The system we were referring early -- referring to

22   earlier prior to the arrest warrant being issued, there was

23   no way for me to be notified about land crossings.

24    Q.   And in the event that the defendant were to travel to

25   Mexico or to Canada, are you aware of any monitoring system

Case: 3:12-mj-07045-VKA  Doc #: 24-1  Filed:  08/24/12  57 of 86.  PageID #: 254
Case: 3:12-mj-07045-VKA  Doc #: 19  Filed:  08/16/12  57 of 86.  PageID #: 145

57

1    that would allow you to intercede in the event that he then

2    made a reservation to Japan from either of those

3    companies -- countries?

4    **A.**  Once they were in those countries?

5    **Q.**  Yes.

6    **A.**  No, I'm not.

7           MS. MANSCHRECK:  Just one moment.

8    BY MS. MANSCHRECK:

9    **Q.**  In your affidavit, you mentioned a variety of models of

10   vehicles, correct?

11   **A.**  Several, yes.

12   **Q.**  Is it your understanding that those vehicles are sold

13   in the United States?

14   **A.**  Yes.

15          MS. MANSCHRECK:  I have nothing further, Your

16   Honor.

17          MR. SQUERI:  I just have a few questions.

18          THE COURT:  Briefly.

19          MR. SQUERI:  Yes, I will be brief, Your Honor.

20                REDIRECT EXAMINATION OF KEVIN BROWN

21   BY MR. SQUERI:

22   **Q.**  Agent, you were asked some questions about

23   Mr. Yoshida's personal situation with his family.

24        Are you aware of him having a wife and two children?

25   **A.**  I'm aware -- I believe that he's married, yes.  I was

1    not aware that there were two children.  I think I believed

2    there was one.  But that's --

3    Q.  You have not conducted any independent investigation

4    into his personal situation, correct?

5              MS. MANSCHRECK:  Objection.

6              THE COURT:  Overruled.

7              MS. MANSCHRECK:  Objection.

8              THE COURT:  I think that's an appropriate

9    question.

10             MS. MANSCHRECK:  I just -- just for vagueness.

11   I'm not quite clear what he means by "personal situation."

12             MR. SQUERI:  Your Honor, the witness can say

13   whether he understands the question.  I think the objection

14   is not appropriate.

15             THE COURT:  I overruled it.

16             MR. SQUERI:  Thank you.

17             THE WITNESS:  Part of my understanding of his

18   marital situation is that when Agent Sante arrived at his

19   house to do the interview, he was, I think, Skyping with his

20   wife in Japan.

21             And I believe I noticed on the visa application

22   that there was mention of his wife, having a wife.  That's

23   the extent of my knowledge.

24   BY MR. SQUERI:

25   Q.  And you are aware of the fact that he has been employed

                Lori A. Callahan, RMR-CRR      (330) 252-6022

1   in the same -- with the same company for over 30 years,

2   aren't you?

3   **A.**  I think give or take a few, yes, he's been with this

4   company a very long time, yes.

5   **Q.**  His entire career?

6   **A.**  I don't know that.  I know a long time.

7   **Q.**  Well, and you've also become familiar with the

8   operations here in the United States, and they're very

9   substantial, aren't they?

10  **A.**  For his company, is that what you're referring to?

11  **Q.**  Yes, employing 500 or more people.

12  **A.**  I believe so, yes.

13  **Q.**  And you are -- you made mention of your experience in

14  other antitrust matters in response to questions from the

15  government.

16      In how many cases were you the lead case agent, if you

17  can recall here?

18  **A.**  For antitrust investigations?

19  **Q.**  Yes.  Yes, sir.

20  **A.**  Two or three.

21  **Q.**  And the government asked you some questions about the

22  company's exposure here.

23      Are you familiar with the fact that typically companies

24  that become subject to antitrust investigations look to

25  cooperate with the government, in your experience?

Case: 3:12-mj-07045-VKA  Doc #: 24-1  Filed:  08/24/12  60 of 86.  PageID #: 257
Case: 3:12-mj-07045-VKA  Doc #: 19  Filed:  08/16/12  60 of 86.  PageID #: 148

60

1          MS. MANSCHRECK:  Objection.

2          THE COURT:  Sustained.  His experience is two or

3     three cases where he's been lead agent.

4     BY MR. SQUERI:

5     Q.  Well, if we expand it to any of the cases that he's had

6     experience with, are you aware that companies typically do

7     look to cooperate with the government under those

8     circumstances?

9          THE WITNESS:  I'm aware that some do, yes.

10    BY MR. SQUERI:

11    Q.  And that it is in the company's interest to have its

12    employees, like Mr. Yoshida, cooperate with the government

13    under those circumstances?

14    A.  I couldn't say.  I think it would depend on when they

15    were involved in the case.

16    Q.  You were asked some questions about this airline

17    scheduling.

18         Just to be clear, do you have any information that

19    Mr. Yoshida attempted to leave the United States any time

20    after May 30, 2012?

21    A.  No.

22    Q.  And there's no evidence that you are aware of that he

23    somehow made reservations later in the day with the -- after

24    you had -- the FBI had gone through its check of the

25    reservation system?

                 Lori A. Callahan, RMR-CRR        (330) 252-6022

Case: 3:12-mj-07045-VKA Doc #: 24-1 Filed: 08/24/12 61 of 86. PageID #: 258
Case: 3:12-mj-07045-VKA Doc #: 19 Filed: 08/16/12 61 of 86. PageID #: 149

61

1    A.   I believe I answered, I'm not aware of him making any

2    reservations.

3    Q.   And I asked you about contacting U.S. consulates here

4    in the United States about the sit- -- excuse me, Japanese

5    consulates here in the United States.

6         Have you attempted to contact Japanese consulates in

7    Canada or in Mexico?

8    A.   No.

9    Q.   And are you aware of whether or not Mr. Yoshida would

10   need a passport in order to travel from Mexico or Canada to

11   Japan?

12   A.   I believe he would.

13   Q.   And just to be clear, do you or do you not recall the

14   details of the debriefing that you conducted of CW-2 after

15   the telephone conversation on May 30, 2012?

16   A.   I recall CW-2 indicating that the telephone

17   conversation had discussed various meetings and price

18   discussions that they had had in the past in Japan.

19        I am -- I believe there was discussion during the

20   debriefing about travel, but it's not as clear in my mind as

21   to details about the price discussions and other meetings in

22   Japan.

23        That's the best answer I can give you.

24   Q.   And it's still your testimony that you do not recall

25   whether he mentioned anything about the JFTC at that time?

1      **A.**  I'm sorry, could you repeat that?

2      **Q.**  And is it still your testimony that you do not recall

3      whether he mentioned anything about the JFTC during that

4      debriefing?

5      **A.**  I don't believe he did mention the JFTC during the

6      debriefing.  I think that's what I had said earlier.

7                MR. SQUERI:  Give me just one moment, Your Honor.

8      BY MR. SQUERI:

9      **Q.**  Was the Department of Justice interpreter present at

10     the time that you were monitoring the telephone call with

11     Mr. Yoshida -- between Mr. Yoshida and CW-2 on May 30, 2012?

12     **A.**  No.

13     **Q.**  It was a different interpreter?

14     **A.**  Correct.

15     **Q.**  And did that interpreter tell you anything about a JFTC

16     conversation?

17     **A.**  Well, that interpreter translated what CW-2 said, which

18     was what I've already testified to.

19     **Q.**  In the debriefing that you mentioned?

20     **A.**  Correct.

21                MR. SQUERI:  I don't have any further questions,

22     Your Honor.  I don't know whether this is a convenient time

23     to break, but I would like to continue my argument and

24     proffer of evidence.

25                THE COURT:  All right.  Thank you.  We will take a

Case: 3:12-mj-07045-VKA  Doc #: 24-1  Filed:  08/24/12  63 of 86.  PageID #: 260
Case: 3:12-mj-07045-VKA  Doc #: 19  Filed:  08/16/12  63 of 86.  PageID #: 151

63

1    break, ten minutes.  Okay.

2            Ms. Interpreter, is this an appropriate time to

3    take a ten-minute break?

4            THE INTERPRETER:  Yes, Your Honor.

5            THE COURT:  All right.  Thank you very much.  We

6    are in recess for ten minutes.

7            MR. SQUERI:  Your Honor, we would excuse the

8    witness.

9            THE COURT:  Oh.  All right.  Thank you.

10           MR. SQUERI:  Should we excuse the witness, I

11   should say?  I don't want to be presumptuous.

12           UNKNOWN SPEAKER:  They're still on the phone.

13           THE COURT:  Pardon?

14           (Inaudible.)

15           THE COURT:  All right.  Agent Brown, you are

16   excused.  You may remain if you wish, or you are free to

17   leave.

18           THE WITNESS:  Thank you, Your Honor.

19           THE COURT:  Thank you.

20           (Thereupon, a recess was had.)

21           THE COURT:  -- on the line?

22           THE INTERPRETER:  Yes, Your Honor.

23           THE COURT:  And the court wants to apologize if

24   the hearing was longer than anticipated.  However, we are

25   concerned with very important rights in criminal cases, and

1    so we are not able to accurately -- accurately estimate the

2    length of time that a hearing will last; and certainly, we

3    would apologize for any inconvenience.

4           But in the greater picture, we have to look at

5    protecting the rights of defendants.  And so we truly

6    apologize if we went over the estimated time.  However, it

7    is beyond our control.  We understand that you only have 20

8    minutes remaining, so we will attempt to complete our

9    hearing within 20 minutes.

10          But the court is very concerned that you would be

11   antagonistic toward the courtroom deputy.  She has no

12   control over how these hearings go.

13          The lawyers are doing their jobs to represent

14   their clients so that we can achieve a sense of justice, and

15   the court certainly would hope that the interpreting

16   service, which is an important service to us, very difficult

17   to achieve, we rely upon you heavily, but we can't control

18   the length of time that a hearing will take.

19          Our job is to protect the rights of people who

20   appear before us, and we do that in the very best manner

21   that we can.  We need your assistance.

22          Is that clear?

23          THE INTERPRETER:  Your Honor, I -- I'd like to

24   respond to that.

25          THE COURT:  Certainly.

Case: 3:12-mj-07045-VKA  Doc #: 24-1  Filed:  08/24/12  65 of 86.  PageID #: 262
Case: 3:12-mj-07045-VKA  Doc #: 19  Filed:  08/16/12  65 of 86.  PageID #: 153

65

1            THE INTERPRETER:  I was originally given an

2     estimate of 60 minutes, and I have been here from 9:00 in

3     the morning Pacific time, and we went on for an hour and a

4     half without any breaks.  And I'm willing to accommodate

5     that, Your Honor.  But I am a contractor to the court, and I

6     do have another matter that I need to attend to at 11:50.

7            THE COURT:  The court understands your time

8     schedule.  And so if you have a previous engagement in the

9     next 20 minutes, we anticipate completing the hearing once

10    you give us notice that you have another matter scheduled.

11    I have advised counsel and told them that they must wrap up

12    in the next 20 minutes so that you can leave.

13            However, we do appreciate being cooperative with

14    each branch of the government and the court.  And so we all

15    try to work together and accommodate each other.

16            I will be respectful of your schedule.  And if

17    indeed we were thoughtless and did not give you a break,

18    certainly the court would not be opposed to an interpreter

19    saying, "Your Honor, I need a break at this time."

20            I know that it's very intense work, and I

21    appreciate that.  So anytime we're going over, if you were

22    to say, "I'm sorry, I need a break," that's fine.  We all

23    understand that.  Okay?

24            THE INTERPRETER:  Thank you, Your Honor.

25            THE COURT:  All right.  We'll now proceed.  And

                 Lori A. Callahan, RMR-CRR          (330) 252-6022

Case: 3:12-mj-07045-VKA  Doc #: 24-1  Filed:  08/24/12  66 of 86.  PageID #: 263
Case: 3:12-mj-07045-VKA  Doc #: 19  Filed:  08/16/12  66 of 86.  PageID #: 154

66

1    I'm going to just limit each side to ten minutes, because

2    that's all we have.  Anything more that you want to submit,

3    you can do it by paper.  You can file any written arguments

4    that you wish.  I would appreciate your making your proffer

5    at this time.

6              MR. SQUERI:  Yeah.  I'll try to be as quick as

7    possible, Your Honor.

8              First, Your Honor, let me proffer some additional

9    materials to the court.  I have a series of documents.

10             May I approach just to hand them to the court?

11             THE COURT:  Yes, certainly.  Thank you.

12             MR. SQUERI:  I won't spend any time going through

13   the detail, but let me tell you what I've handed to you,

14   Your Honor.

15             First is an extradition treaty between the United

16   States and Japan.  And I would just note for the record that

17   the United States Justice Department has taken the position

18   that antitrust offenses are extraditable under that treaty.

19             Second is a treaty between Japan and the United

20   States, mutual legal assistance in criminal matters.  That's

21   dated August 5, 2003.  This is a document that I obtained

22   from the U.S. Justice Department's website.

23             Third is an agreement between the government of

24   Japan and United States regarding cooperation on

25   anticompetitive activities.  It's an agreement between the

1    Japanese antitrust authorities and those of the United

2    States.

3           And I also included a couple of page Internet

4    printout that just refers to an Internet -- an international

5    cartel working group, which happens to be co-chaired by the

6    antitrust competition agencies of Germany, the United States

7    and Japan.

8           And my point in presenting these documents is,

9    one, to point out to the court that, in fact, extradition is

10   a possibility.  It's the reason why many Japanese

11   individuals have, in fact, surrendered to the United States.

12          And also to point to the cooperative relationship

13   that exists between the government of the United States and

14   Japan.

15          And during my questioning of Agent -- of Agent

16   Brown, I started to get into some statistics regarding the

17   Antitrust Division.  You can see that in the last printout

18   that I provided, on pages 4 and 5, where I would have gotten

19   the data that I intended to refer to.

20          In the last five fiscal years, there have been an

21   average of over 120 investigations pending a year that's

22   brought by the Antitrust Division, and charges brought

23   against approximately 316 individuals by the Antitrust

24   Division.  And these are usually going to be antitrust

25   prosecutions.  There are times when other federal statutes

Case: 3:12-mj-07045-VKA Doc #: 24-1 Filed: 08/24/12 68 of 86. PageID #: 265
Case: 3:12-mj-07045-VKA Doc #: 19 Filed: 08/16/12 68 of 86. PageID #: 156

68

1    are enforced.  But typically, these are antitrust

2    prosecutions.

3            And the point here is that the numerous antitrust

4    prosecutions brought by the Antitrust Division is at most,

5    when you look at -- it's highly extraordinary to impose the

6    conditions of the na- -- of the nature that have been

7    imposed here.

8            Now, we don't --

9            THE COURT:  Have you looked at the bond conditions

10   in those cases?

11           MR. SQUERI:  What we have done, Your Honor, and --

12   and I need to make sure the court understands that our data

13   is going to be more limited than that -- than that of the

14   Justice Department.

15           But I asked a paralegal to go back three years and

16   look at each of the antitrust prosecutions that could be

17   identified, and we were only able to identify one instance

18   involving a Taiwanese individual, and I would observe Taiwan

19   does not have an extradition treaty with the United States,

20   where electronic monitoring was required.

21           I can represent to the court that it wasn't done

22   in any other instance, that's all -- all that I found.

23           And I can represent to the court that in my years

24   practicing in this area, this is a highly unusual condition

25   to impose.

Case: 3:12-mj-07045-VKA  Doc #: 24-1  Filed:  08/24/12  69 of 86.  PageID #: 266
Case: 3:12-mj-07045-VKA  Doc #: 19  Filed:  08/16/12  69 of 86.  PageID #: 157

69

1          And what I would also proffer to the court is, as

2      the court knows, Mr. Yoshida has willingly surrendered his

3      passport.  DOJ has tried to minimize the significance of his

4      doing so, and suggested that he can easily obtain a new

5      passport and flee the country.

6          Your Honor, this is simply not the case.  We

7      checked with the Japanese consulate in Detroit in order to

8      see whether or not DOJ's bald assertions could be

9      substantiated, and they can't be.

10          I would proffer to the court that I called the

11      Japanese consulate in Detroit, Michigan.  The consulate has

12      responsibility for matters in Michigan and Ohio.  I was

13      directed to and spoke with an individual by the name of Jim

14      Fergersky, who is employed by the consulate in the position

15      of security adviser.

16          What I learned from Mr. Fergersky is as follows:

17          One, neither the consulate nor the Japanese

18      government with whom he checked has knowledge of any black

19      market for Japanese passports in the United States.

20          Two, Japanese consulates would not issue a new

21      passport to a Japanese citizen if made aware of the fact

22      that the reason one is needed is because it was surrendered

23      to a U.S. court.

24          Moreover, if a person like Mr. Yoshida were to

25      obtain a new passport by lying that he had, for example,

1    lost one, he would be committing a crime under Japanese law

2    and subject to fine and imprisonment up to five years in

3    Japan, his home country.

4         The important point here, Your Honor, is that by

5    having Mr. Yoshida surrender his passport as has been done

6    here, this is more than enough, in our view, to secure his

7    reporting back to the court and answering to the charges

8    here.

9         Your Honor, we have already addressed the fact

10   that no one was planning to move Mr. Yoshida outside the

11   United States in order to advance any antitrust prosecution.

12        We heard the testimony that there was no

13   indication that he had made reservations, even after the

14   time he was interviewed by DOJ.

15        And the evidence actually indicates anything but a

16   desire to be responsive to U.S. authorities.  He con- -- the

17   way he conducted himself on the day that the FBI visited his

18   home is indicative of a person looking -- who is not looking

19   to evade prosecution.  He gave the FBI a substantial

20   interview on that day.

21        And the suggestion in the brief -- their brief of

22   the United States that somehow he was looking to engage in

23   new antitrust violations, it's simply not substantiated by

24   the evidence.

25        I won't review the testimony, but there is no

1    evidence that he ever attempted to engage in an antitrust

2    violation here in the United States.

3          And the court sustained my -- the objection of the

4    government when I asked about whether any analysis had been

5    done on impact on U.S. pricing.  I asked that question for a

6    very important reason, and that is because this conduct

7    occurred in Japan, there -- the extraterritorial assertion

8    of jurisdiction by the United States must meet certain

9    requirements, including that it did, in fact, have a

10   substantial effect on U.S. commerce.

11         This goes back in jurisprudence of -- to the

12   jurisprudence of Judge Learned Hand in 1945, and is

13   memorialized in the Antitrust Improvements Act --

14   International Antitrust Improvements Act -- excuse me, I've

15   got to restate that, the Foreign Trade Antitrust

16   Improvements Act of 1982, which requires that there be a

17   substantial and direct effect on U.S. commerce.

18         And my point here, Your Honor, is when you look at

19   the strength of the evidence argument made by DOJ, it's not

20   quite that clear.  And I know they'll disagree with me, and

21   today is not the day to get into that, but it's not that

22   clear.  As a matter of fact, there would be a significant

23   defense.

24         I am going to try to get through this.  I'm near

25   the end, Your Honor.

                Lori A. Callahan, RMR-CRR        (330) 252-6022

1          Your Honor, very briefly, the government's

2    assertions about the risk of flight with respect to

3    Mr. Yoshida are not supported by the record.  He's here in

4    the United States.  He will remain in the United States.

5          Counsel for the company is here in the courtroom,

6    can represent to the court that they expect him to stay in

7    the United States if the court wishes to hear from her.

8          And, Your Honor, it is -- it is sufficient to

9    impose the requirement that he stay in the country, that he

10   respond and report to the authorities.  There is no need for

11   this electronic monitoring.

12          And I do need to make one important point, because

13   this is, I know, a point that's important to the court.  And

14   that is, what's the big deal?  The big deal, Your Honor,

15   is -- is, first of all, that as I've explained to the court,

16   there is some Japanese cultural issues here, and there are

17   also issues, Your Honor, relating to his ability to interact

18   with customers.

19          As I mentioned in chambers, he's only met with a

20   customer on one occasion in the 50 days since he has --

21   since he was arrested.  This is a source of embarrassment.

22   He's dealing with other Japanese customers here in the

23   United States.

24          THE COURT:  How is his ability to interact with

25   customers affected?

Case: 3:12-mj-07045-VKA Doc #: 24-1 Filed: 08/24/12 73 of 86. PageID #: 270
Case: 3:12-mj-07045-VKA Doc #: 19 Filed: 08/16/12 73 of 86. PageID #: 161

73

1         MR. SQUERI:  It's --

2         THE COURT:  The electronic monitoring is not

3    visible, is it?

4         MR. SQUERI:  Your Honor, if somebody crosses their

5    legs, if they're -- they spent -- I understand that when

6    Japanese business folks get together, it's not for a

7    one-hour meeting, they get together for a long time, for a

8    number of hours.  And they're going to see it at some point.

9    And this is -- it's a real source of embarrassment and shame

10   in their culture -- under their culture.

11        And I still -- and we still also have to come back

12   to the fact that under the Bail Reform Act, it should be the

13   least -- the least restrictive conditions that are needed

14   under the circumstances.

15        THE COURT:  Condition or combination of

16   conditions.

17        MR. SQUERI:  Yes.  Yes, Your Honor, I understand.

18   I am just trying to speak quickly right now.  I apologize.

19        THE COURT:  That's okay.

20        MR. SQUERI:  But in this particular instance, the

21   electronic monitoring is not required.  He has roots here.

22   He has a substantial employer.

23        THE COURT:  What are his roots here other than his

24   employment?

25        MR. SQUERI:  His roots here don't go beyond his

1    employment, but I think it would be unfair to not

2    characterize those as significant.  He has worked for this

3    company his entire working career, over 30 years.  If he

4    were to do something harmful to his company that would make

5    his company look bad, that -- that is not something

6    inconsequential.

7            And I still go back to the fact, Your Honor, that

8    this is highly unusual and, you know, and he shouldn't be

9    treated differently.

10            THE COURT:  All right.  You've made your point.

11            If you would like to submit additional argument in

12    writing, you may do so.  I apologize for having --

13            MR. SQUERI:  I understand.

14            THE COURT:  -- to limit your time.  However, I

15    want to be fair to the government and give them an

16    opportunity to argue as well.

17            MR. SQUERI:  I understand, Your Honor.

18            THE COURT:  You may submit any additional written

19    argument that you wish.

20            MR. SQUERI:  Thank you, Your Honor.

21            THE COURT:  Thank you.

22            Ms. Manschreck?

23            MS. MANSCHRECK:  Thank you, Your Honor.

24            Your Honor, the defendant is a Japanese national

25    without substantial ties to the United States.  He has been

1     here on a temporary work assignment since August of 2011.

2     His wife and his family are in Japan.  He has no known

3     significant assets here, neither a house nor car in his

4     name.

5              He has been charged with a serious crime, which

6     carries a ten-year penalty maximum.  Our preliminary

7     calculation of his guidelines range is between 33 and 41 --

8     sorry, 33 and 41 months' imprisonment.

9              And he is aware of a variety of sources of

10    evidence, including his own recorded statements in a call,

11    as well as his admissions during an interview, which have

12    not been undermined in the course of this hearing as it

13    relates to their being incriminating.

14             The defendant's challenge to the jurisdiction of

15    the United States in relation to this case, the government

16    would submit, is unsubstantiated, but in all events, would

17    be fully litigated, and, thus, is not the sort of thing --

18    we would describe it as a thin reed upon which to conclude

19    that he should not be concerned about facing potentially

20    significant jail time, and, therefore, have a motive to

21    leave the United States.

22             As Your Honor has noted, the defendant has not

23    identified anything that a location monitoring prevents him

24    from doing.  And indeed, Your Honor's prior order modifying

25    the conditions of release have allowed him to travel under

1    certain circumstances to visit customers, and has addressed

2    the specific restrictions that he had identified were

3    preventing him from doing his job.

4          Your Honor, location monitoring combined with the

5    other conditions that have been imposed are indeed the

6    combination of conditions that is least restrictive, but

7    necessary to assure his continued appearance at court dates.

8          In regards to the extradition treaty, Your Honor,

9    I would point you to Article V of that extradition treaty

10   that the defendant has put in front of you today, which

11   specifically states that it is within the Japanese

12   Government, as it is in the United States Government's

13   discretion whether to extradite their own national.  And for

14   that reason, it is not a treaty upon which we can

15   definitively rely so that the defendant would appear for

16   court dates.

17         The other thing that I would -- I would proffer as

18   a professional representation is the fact that Japan has

19   never extradited someone for an antitrust crime.

20         With respect to the defendant's ability to obtain

21   a passport in an embassy, I too can make a representation

22   based on the Department of Justice's contact at the -- at

23   the Japanese embassy, which is the legal attache there, a

24   Mr. Watanobbi, who has said that the Japanese embassy and

25   consulates in the United States do not have any established

1    procedure to prevent the issuance of a new passport to a

2    Japanese national who is a fugitive or is otherwise

3    violating a court order.

4            They could ask the foreign ministry in Tokyo on a

5    case-by-case basis whether the ministry would be willing, at

6    the request of the U.S. Government, to order its consular

7    affairs officials in the U.S. not to issue a new passport to

8    a particular individual, but it is not at all clear how the

9    foreign ministry would respond to such a request.

10           In other words, there is no guarantee that we can

11   prevent him from obtaining a new passport and absconding in

12   the event that he is not on location monitoring.

13           As was brought out during the testimony of Agent

14   Brown, the defendant would be capable of traveling to Canada

15   or to Mexico and obtaining a passport from the consulate in

16   those countries, and then absconding to Japan as well.

17           The defendant has pointed to a variety of

18   statistics.  I haven't had a chance to fully review them.

19   But what I can say is that the individual that Mr. Squeri

20   pointed out during his argument from Taiwan, that defendant

21   is named Homy Hong-Ming Hsu, and he is the most recent

22   arrest in an antitrust case.  He was arrested last year.

23           His case is in the Northern District of

24   California.  And I have a copy of the magistrate's order

25   denying a similar motion in that case.  That defendant was

78

1   also placed on location monitoring.  He's a Taiwanese

2   national.  He was arrested on a layover in Los Angeles, and

3   had been traveling from Taiwan to Mexico.

4           The orders -- the conditions of his release were

5   electronic monitoring, travel restricted to the Northern

6   District of California, curfew, of the same duration as the

7   defendant has, and the allowance for some limited trips to

8   nearby cities and states.  Very similar to the conditions

9   that are presently imposed upon this defendant.

10          The defendant in that case had wanted to go to

11  Taiwan for Chinese New Year to see his octogenarian parent

12  who was ailing, and the court denied that motion.

13          And I have the order with me, and if you'll allow

14  me to approach, I can give that to you.

15          THE COURT:  Thank you.  And did you give a copy to

16  Mr. Squeri as well?  Thank you.

17          MS. MANSCHRECK:  I have.

18          And I would encourage review of that order,

19  because it's very similar to the situation with the

20  defendant here.  That defendant had virtually no ties to the

21  United States.  He was facing also a serious charge of an

22  antitrust violation.

23          And the judge noted specifically that the company

24  in Taiwan would have an incentive not to let him return,

25  because they too would face charges.

79

```
 1          And I would note that that particular defendant's
 2   bond was set at an even higher amount than this defendant's.
 3          Other than that case, I am not aware of any other
 4   comparable case of an antitrust defendant who is a foreign
 5   national without substantial assets in the United States who
 6   is in the United States whom we have not arrested.
 7          Other than directing you also to the pretrial
 8   services conclusion with respect to this defendant, I would
 9   otherwise rest on our briefs and on the evidence that you've
10   heard today.
11          THE COURT:  All right.  Thank you very much.  I
12   can leave you one minute.  Is that right, Ms. Interpreter?
13          MR. SQUERI:  I think she has until ten to, Your
14   Honor, she said.
15          THE INTERPRETER:  Yes, Your Honor.
16          THE COURT:  Pardon?
17          MR. SQUERI:  I think she said she has until ten
18   minutes before the hour.
19          THE COURT:  That's what it is.
20          MR. SQUERI:  Oh, that's -- that was, I guess --
21          THE COURT:  I have just one quick question I need
22   to ask you, and any additional comments you want to submit
23   in writing, either counsel can do that.
24          Does your client interact only with Japanese
25   companies and contacts and customers?
```

Lori A. Callahan, RMR-CRR          (330) 252-6022

1          MR. SQUERI:  I'd have to ask him to be able to

2     make that broad statement.

3          THE COURT:  Okay.

4          MR. SQUERI:  But I understand, Your Honor, that he

5     principally does, because, yeah, he's dealing with Japanese

6     auto manufacturers here in the United States.

7          THE COURT:  All right.  Thank you.

8          MR. SQUERI:  If I could just make a few very quick

9     points in response, Your Honor.  I'll take 60 seconds.

10         THE COURT:  Sixty seconds.

11         MR. SQUERI:  Yeah.  I think one of the things

12    that's very important that the court just heard is that

13    consistent with the research we did, the Justice Department

14    could only identify one circumstance where this has been

15    done before.  And I think it's important to point out that

16    that was the chairman of the board of this company.

17    Mr. Yoshida doesn't hold a position of that -- of that

18    level.

19         And again, as I pointed out earlier, Your Honor,

20    Taiwan does not have an extradition treaty with the United

21    States.

22         And it's important to note that the Justice

23    Department, in taking its positions regarding extradition

24    from Japan, has -- has convinced a number of people to plead

25    guilty here in the United States, about ten or so just in

Lori A. Callahan, RMR-CRR          (330) 252-6022

1    the past -- past year.

2            And I have to take strong issue with counsel's

3    statement that there hasn't been anyone here in the United

4    States similar to Mr. Yoshida where there is a pending

5    antitrust investigation.  I know personally of situations

6    where the Justice Department had individuals employed here

7    in the United States, whose -- whose homes were in Japan and

8    were under those circumstances, there weren't -- it wasn't a

9    rush -- a rush to an arrest here.

10            I think what happened here was there was a rush to

11   arrest based on erroneous information in a telephone

12   conversation.  It's unfair to treat Mr. Yoshida differently

13   because the Justice Department made a mistake with respect

14   to a crucial bit of factual information.

15            THE COURT:  All right.  Thank you very much.

16            Does either counsel want to submit anything

17   further to the court in writing, any written argument?

18   Ms. Manschreck?

19            MS. MANSCHRECK:  Your Honor, we'll want to review

20   what the defendant had submitted --

21            THE COURT:  All right.

22            MS. MANSCHRECK:  -- and make a determination about

23   that.

24            THE COURT:  Can I give you ten days?  Is that

25   enough time for each of you to submit any additional

                    Lori A. Callahan, RMR-CRR        (330) 252-6022

1    filings?

2            MR. SQUERI:  If I could ask, how long can it be

3    before we get the transcript?  I'm sure that's going to

4    govern what the government does, too.

5            We'll get it to you within ten days, Your Honor.

6            THE COURT:  Thank you.

7            MR. SQUERI:  Thank you.

8            THE COURT:  Ms. Interpreter, thank you very much

9    for your services this afternoon.  I thank you on behalf of

10   counsel, the parties and the court, and I hope that you can

11   make it to your next engagement on time.  Thank you.

12           THE INTERPRETER:  Thank you very much, Your Honor.

13           THE COURT:  (Inaudible) submitted a motion,

14   stipulated motion, and the court has reviewed the stipulated

15   motion and the court finds it well taken and the court will

16   grant --

17           Can you hear me now?  I think that was my fault.

18           There is also pending before the court a second

19   joint motion to extend time for a preliminary hearing

20   pursuant to Rule 5.1(d) and to extend time to return

21   indictment pursuant to 18, U.S.C., Section 3161(h).

22           The court has reviewed the joint motion and the

23   proposed order, and the court is satisfied that the motion

24   is well stated, based upon good grounds, and the court will

25   grant the order on joint motion.

               Lori A. Callahan, RMR-CRR        (330) 252-6022

Case: 3:12-mj-07045-VKA  Doc #: 24-1  Filed: 08/24/12  83 of 86.  PageID #: 280
Case: 3:12-mj-07045-VKA  Doc #: 19  Filed: 08/16/12  83 of 86.  PageID #: 171

83

1              Anything further?

2              Okay.  And the court is instructed that she should

3      confirm the date of the preliminary hearing on September

4      12th, 2012, at 11:00 in the morning, at which time we

5      anticipate having a live translator.

6              And the time for filing the indictment has been

7      extended from August 22nd to September 21st, 2012, pursuant

8      to Title 18 of the United States Code, Section 3161(h).  And

9      the ends of justice, the court finds, are thereby served by

10     extending this time so that the parties can have an

11     opportunity to fully explore the opportunity for an

12     expeditious and fair resolution of this matter.

13             MR. SQUERI:  Just one quick question.

14             THE COURT:  Sure.

15             MR. SQUERI:  In terms of calculating the time when

16     we're supposed to make our written submissions, would that

17     be ten -- ten --

18             THE COURT:  Days.

19             MR. SQUERI:  -- calendar days?

20             THE COURT:  Excluding weekends.

21             MR. SQUERI:  Oh, excluding weekends, so we're

22     going business days.  Okay.  Thank you.  I just wanted to be

23     clear on that.

24             THE COURT:  Certainly.  Thank you.

25             Anything further from Ms. Manschreck?

1          MS. MANSCHRECK:  No, Your Honor.

2          THE COURT:  Mr. Miller?

3          PROBATION OFFICER:  No, Your Honor.  Thank you.

4          THE COURT:  Thank you very much.  That will

5    complete this -- oh, I did want to know the name of company

6    counsel.

7          DANIELLE:  Danielle (inaudible.)

8          THE COURT:  Do you have a business card?

9          DANIELLE:  I do.

10          THE COURT:  Thank you.

11          And that will complete this hearing.  Thank you.

12          (Proceedings concluded at 2:55 o'clock p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3        I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled

5   matter.

6

7

8              s/Lori A. Callahan
               Lori Ann Callahan, RMR-CRR
9              U.S. District Court, Suite 568
               2 South Main Street
10             Akron, Ohio  44308
               (330) 252-6022

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2

3       DIRECT EXAMINATION OF KEVIN BROWN              11
        BY MR. SQUERI
4       CROSS-EXAMINATION OF KEVIN BROWN              45
        BY MS. MANSCHRECK
5       REDIRECT EXAMINATION OF KEVIN BROWN           57
        BY MR. SQUERI

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25